DONALD SPECTER (SBN 83925)
dspecter@prisonlaw.com
KELLY KNAPP (SBN 252013)
kknapp@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

JESSICA VALENZUELA SANTAMARIA
(SBN 220934) jsantamaria@cooley.com
JEFFREY W. WALKER (SBN 280505)
jwalker@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000

KENDALL DAWSON WASLEY(SBN 252294)
kendall@dawsonwasleylaw.com
PMB 233
1520 E. Covell Blvd.
Davis, CA 95615
Telephone: (408) 827-5024

Attorneys for Plaintiffs Brian Chavez and
Brandon Bracamonte

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CHAVEZ AND BRANDON BRACAMONTE, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>COUNTY OF SANTA CLARA,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## NATURE OF THE ACTION

**1.** Santa Clara County isolates hundreds of men and women in tiny, filthy concrete jail cells as small as six by seven feet, and keeps them locked in these cells for 22 to 24 hours of every day, permitting them scant human contact, sunlight, fresh air, exercise, and environmental stimulation for months or even years at a time. The County does this to people who have not been convicted and are simply awaiting a court date.

**2.** The County locks up, indefinitely, hundreds of individuals in these cramped jail cells at any given time. The County only allows them to go to small "yards" that are enclosed within tall, solid concrete walls and steel mesh for a maximum of three hours a week, which is their only access to fresh air and sunlight. For almost all of the remaining hours, the County forces individuals to sit idle locked in their cells, often for 47 or more hours at a time.

**3.** Santa Clara County, by its policy and practice of isolating people in these inhumane conditions, is subjecting individuals to serious psychological and physiological harm. Many individuals are already experiencing perceptible harm, including anxiety, depression, social withdrawal, paranoia, agitation, and suicidal ideation. People with pre-existing mental illness are suffering from more acute symptoms as a result of these policies and practices. Jail officials have consistently denied or ignored individuals' administrative grievances and written requests to be removed from isolation. The County is deliberately indifferent to the serious risk of harm caused by these conditions.

**4.** Santa Clara County has no legitimate justification for these inhumane conditions. The classification system that the County uses to identify which individuals to isolate in "solitary confinement" is, in the words of the County's own consultants, unreliable, invalid, and without integrity. Many people currently in solitary confinement have not knowingly violated jail rules in years, if ever, and the County has never provided any meaningful explanation for housing them in these harsh conditions.

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

5.      Plaintiffs Brian Chavez and Brandon Bracamonte, and the class they represent, seek a declaration that Santa Clara County's ongoing practices violate their constitutional rights, and injunctive relief compelling Defendant to cease holding people in the inhumane conditions of solitary confinement for prolonged periods, and to provide individuals with meaningful notice and opportunities to challenge decisions to place them in solitary confinement.

## JURISDICTION

6.      The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

7.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; and 42 U.S.C. § 1983.

## VENUE

8.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by plaintiffs and the class have occurred in this District and Defendant is located in this District.

## INTRADISTRICT ASSIGNMENT

9.      Assignment to any division within this district is proper pursuant to Civil L.R. 3-2(c) since this is a prisoner civil rights action.  The events giving rise to this claim arise in the County of Santa Clara.

## PARTIES

**Plaintiffs**

10.      Plaintiff Brian Chavez is a pretrial detainee in the Santa Clara jails in custody of Defendant Santa Clara County.  He was arrested in November 2011 on narcotics and conspiracy charges, and has been subsequently indicted on conspiracy, narcotics, and gang charges.  He has not been convicted of any of these charges.

2

1   Defendant has never charged him with any serious jail infractions, and he has not engaged

2   in any violent behaviors since he came to the jail four years ago.  Santa Clara officials

3   housed him in various locations within the jail facilities, and appointed him a jail "trustee".

4   Jail officials appoint as trustees only those individuals who have consistently demonstrated

5   good behavior, and give them special privileges and more time out of their cells than other

6   people.   He remained a trustee until November 2014 when, without any explanation,

7   notice, hearing, or opportunity to challenge the decision, Defendant stripped Mr. Chavez of

8   his assignment as jail trustee and moved him to solitary confinement in the South Jail

9   Third West Maximum Unit ("Third West Max").   On November 4, 2015, Defendant

10  moved him to another solitary confinement unit in the North Jail again without any

11  explanation.   In response to Mr. Chavez's administrative grievances requesting to be

12  moved to less restrictive housing, Defendant has told him only that he is "properly housed"

13  and that his file will be reviewed every 30 days.  Defendant has never allowed Mr. Chavez

14  to participate in such reviews, if, indeed, they have happened, or informed him of their

15  outcome.

16         **11.**    Plaintiff Brandon Bracamonte is a pretrial detainee in the Santa Clara jails in

17  custody of Defendant Santa Clara County.  He was arrested in April 2012 for carjacking

18  and has subsequently been indicted on conspiracy, robbery, and gang charges.  As with

19  Mr. Chavez, Mr. Bracamonte has not been convicted of any of these charges.  Defendant

20  has housed him in various locations and security levels within the jail facilities, including

21  in dorms and with cellmates, and has never found him guilty of any serious rule violations

22  or violent behaviors.  Also like Mr. Chavez, jail officials appointed Mr. Bracamonte as a

23  jail trustee.  In August 2013, the County alleged that Mr. Bracamonte participated in a

24  "gang assault," but later concluded there was no credible evidence supporting the

25  allegations, and so did not formally charge him with a violation of jail rules.  Similarly, the

26  District Attorney declined to prosecute the case.   One to two months after that

27  unsubstantiated incident, Defendant moved him to Second East Maximum without any

28

3

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

explanation, notice, or opportunity to challenge the decision.  From November 2014 until November 4, 2015, Defendant locked him in solitary confinement in Third West Max.  On November 4, 2015, Defendant moved him to another solitary confinement unit in the North Jail without any explanation.  In response to Mr. Bracamonte's administrative grievances requesting to be moved to less restrictive housing, Defendant told him that he must be housed in solitary confinement because of the alleged "gang assault" in August 2013 for which he was never even charged, much less found guilty, and which he had no opportunity to challenge.

12.    From November 2014 until November 4, 2015, Defendant locked Mr. Chavez and Mr. Bracamonte in separate six by seven foot windowless cells for at least 23 hours a day in Third West Max.  The County exacerbated the conditions of these exceedingly small cells by failing to keep them clean, thereby forcing Mr. Bracamonte and Mr. Chavez to live in areas covered in filth and grime.  Defendant typically only allowed them out of their cells every other day, which means they often spent more than 48 consecutive hours locked down.  Defendant never took them to the "yard," and denied them any access to natural light or fresh air, for seven months (November 2014 - June 2015).  In July 2015, Defendant allowed them one hour a week in a caged enclosure on the "yard" before sunrise.   Mr. Chavez cannot remember the last time he felt direct sunlight.

13.    When the County infrequently allowed them visits from their families, Defendant took Mr. Chavez and Mr. Bracamonte out of their cells for a maximum of two hours a week for non-contact visits through a glass window, speaking over a phone.  The only other time the County allowed them out of their cells was when correctional officers moved them, alone, to another six by seven foot empty cell and adjacent stand-up shower every other day for one hour.  Defendant always chained and shackled them and regularly strip searched them before they returned to their cells.

14.    On November 4, 2015, Defendant moved Mr. Chavez, Mr. Bracamonte, and a number of other individuals from Third West Max to another solitary confinement unit

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

(4C) in the North Jail.[1]   But the conditions are no better.  The cells in this unit measure approximately eight by ten feet, and there is a window in each cell that filters in some light through frosted glass.  Plaintiffs are still locked down, alone, at least 23 hours a day in unsanitary cells that Defendant has failed to clean.  Defendant has denied them access to a "yard" since November 4, 2015.

15.     As a result of his prolonged isolation in solitary confinement, Mr. Chavez is suffering from debilitating psychological damage.  Although he is only 35 years old, he is preoccupied with fears of dying alone and unnoticed in his cell.  He withdraws from his rare opportunities for social interaction, including when his family and friends attempt to emotionally connect with him through occasional jail visits and letters.  He is quickly and easily irritated by minor noises such as someone tapping their fingers on a nearby surface.  He is often disoriented and confused about the time of day.

16.     As a result of his prolonged isolation in solitary confinement, Mr. Bracamonte is also suffering from debilitating psychological and physiological damage.  He suffers from insomnia and chronic fatigue.  He suffers from anxiety that causes him to pace back and forth, to the extent possible, in his small cell.  Before the County sent Mr. Bracamonte to solitary confinement, he passed the time by reading books.  Now he cannot read more than a few paragraphs without losing focus and needing to start over.  He is hypervigilant about certain noises; for instance he jumps to his feet when he hears alarms, officers running, or cell doors popping open because he fears someone is coming to assault him.  He feels numb and distant when he speaks to his family, and he is no longer able to emotionally connect with his wife and children.

_____

[1] This move occurred three days before members of a Blue Ribbon Commission were scheduled to tour the jail on November 7, 2015.  The Blue Ribbon Commission was formed by the County Board of Supervisors to improve custody operations after three correctional officers were charged with murdering a mentally ill pretrial detainee held in the North Jail.

17.     Mr. Chavez and Mr. Bracamonte have exhausted available administrative remedies.  They brought grievances challenging their conditions in solitary confinement, and their assignment to solitary confinement, but Defendant denied these grievances.

**Defendant**

18.     Defendant County of Santa Clara operates three jail facilities -- the Main Jail Facility (including the South and North Jails), Elmwood Women's Correctional Complex, and the Elmwood Men's Correctional Complex -- that incarcerate over 3,500 individuals. The County is responsible for ensuring that the basic human needs of individuals in its custody are met, and for ensuring that individuals are not at risk of serious harm, including by providing appropriate funding, oversight, and corrective action to ensure adequate conditions.   The County is also responsible for ensuring that jail policies and practices do not violate individuals' substantive and procedural due process rights.

## FACTUAL ALLEGATIONS

I.     **Santa Clara County Locks People in Inhumane Conditions for Months or Years at a Time.**

19.     Defendant, by policy and practice, locks hundreds of people in small cells for at least 23 hours a day for months or years at time.  The United States Department of Justice defines "solitary confinement" as the "state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others."[2]  Over the last several decades, mental health and correctional experts have documented the harmful effects of prolonged solitary confinement.  Prolonged solitary confinement is defined as any period of time over three to four weeks.[3]  Common side-

---

[2] U.S. Department of Justice, Investigation of State Correctional Institution at Cresson, May 13, 2013, Attachment #7, p. 5, available at http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf  (last viewed on October 15, 2015).

[3] American Psychiatric Association, Position statement on segregation of people with mental illness (2012), available from
(footnote continued)

effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors. *Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)).   Defendant is deliberately indifferent to the substantial and obvious risk of harm caused by its policy and practice of locking people in solitary confinement for prolonged periods of time.

**A**. **Defendant locks people in cramped cells for at least 23 hours a day.**

**20.**     Defendant locks people in maximum security (including Plaintiffs Chavez and Bracamonte), administrative segregation, or psychiatric housing for 23 hours or more a day.  Most of these individuals are locked alone in gray concrete cells that vary in size from approximately six by seven to eight by ten feet.  Defendant locks some of these individuals in these tiny cells with a cellmate.

**21.**     In the South Jail, which was built in 1956, the cells have no windows.  The doors to most of the cells are bars, but there is no visibility from one cell into another cell. The cells only have room for a bed, writing table and stool, and a combined toilet and sink. The cells have no access to fresh air or natural light, and no clocks.

**22.**     In the more modern North Jail and Elmwood facilities, the gray concrete cells are slightly bigger (eight by ten feet) and have the same limited furnishings, as well as small, opaque windows to the outside.  Because the window glass is opaque, the individuals have no view of the outside world.  The doors are solid metal with a food port and a small rectangular window with a view toward a dayroom.  There is no fresh air in the cells and almost no natural light filters through the frosted glass in the exterior window.

**23.**     Conditions in the Third West Maximum Unit ("Third West Max"), located in the antiquated and worn down South Jail, are even more austere.  This unit has the smallest

http://www.psychiatry.org/File%20Library/Learn/Archives/Position-2012-Prisoners-Segregation.pdf. (last viewed on November 2, 2015).

cells, and there is no room for a writing table or stool.  The doors are solid metal, with a small rectangular window and food port that faces out to a dim, narrow hallway.  There is no access to fresh air or natural light, and there are no clocks.

24.     Defendant typically only allows people in solitary confinement out of their cells for "recreation" three hours a week; a few units periodically receive four hours a week.  "Recreation" consists of time spent in a dayroom, "yard," or another cell.  Defendant prohibits them from attending any structured group recreational, religious, educational, or vocational programs.

25.     In the South Jail, the only access to fresh air and natural light is on the "sundeck," where Defendant locks individuals alone in cages that measure approximately seven by fifteen feet.  The cages are located in an area completely enclosed by tall concrete walls and steel mesh overhead.  An individual on the "sundeck" can the see the sky and the tops of nearby buildings, but nothing else.  There is nothing in the cages – no place to sit, no exercise equipment, no toilet, and no access to water.  Nonetheless, some individuals choose to go to this "yard" just to get out of their cells and to interact with people in the other cages.  There are no dayrooms.

26.     In the North Jail, people can go to a "yard," alone, which is entirely enclosed by concrete walls and steel mesh, with no seating, equipment, or activities.  In the "yards" connected to the dayrooms, individuals can move freely back and forth during the regularly scheduled time they are allowed out of their cells, always alone.  In the units where the "yards" are separate from the dayrooms, people must ask the housing unit officers to go to the "yard" during their out-of-cell time.  If the housing unit officers decide to grant their requests, the individuals must be chained and shackled, and, as such, Defendant sometimes denies their requests because transporting them is burdensome.  People in the North Jail units are only given 25 minutes to one hour of out-of-cell time a day, and within this time they must also shower, make phone calls, and use grooming supplies (e.g., razors, nail clippers, hair clippers, etc.).   This is also the only time

1  Defendant allows individuals to interact face-to-face with other people through the glass

2  windows of closed cell doors.  Thus, many individuals do not use the "yard" because there

3  is not enough time to go there and fulfill their other basic needs.

4      27.    In many of the Elmwood cell-units, the outdoor "yards" are similar in design

5  to those in the North Jail.  Defendant allows people out of their cells to use the "yard" and

6  dayroom one hour every other day.

7      28.    All but a few of the Elmwood and North Jail dayrooms are stark and bare.

8  They do not have any tables, seating, or recreational activities other than televisions.

9      29.    In Elmwood, an instructor comes once a week to teach yoga to women in

10  solitary confinement.  However, the women are not let out of their cells for this class.

11  Instead, the instructor stands in the dayroom.

12      30.    From November 2014 until the end of June 2015, Defendant never took

13  individuals in Third West Max, including Plaintiffs, to a "yard" or "sundeck."  Instead,

14  Defendant gave them "recreation" time in an empty cell the individuals in solitary

15  confinement have named "The Box."  The Box is a six by seven foot windowless cell that

16  is empty except for a phone and a toilet.  The door to the cell is left open so that

17  individuals can come and go into the small stand-up shower immediately adjacent to the

18  cell.  There is no place to sit, not enough room to do any meaningful exercise, and the cell

19  and shower are filthy.  Defendant took people to The Box every other day for one hour,

20  which was their only time to shower and use the phone.  However, due to the schedule

21  created and maintained by correctional officers, the single hour in The Box was regularly

22  late at night.  When offered at this time, people sometimes refused because they could not

23  call their families or attorneys at that late hour, and when they were done showering there

24  was nothing left to do but stand there and wait until the hour was up.

25      31.    On June 25, 2015, the Prison Law Office sent a letter to the Sheriff notifying

26  her, among other things, that she was obligated to provide outdoor time to people in Third

27  West Max.  After receiving the June 25, 2015 letter, the County began taking people from

28

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

this unit to the "sundeck" one hour a week.  Before that, these individuals had not been outside in *seven months.*

32.     On November 4, 2015, Defendant moved Plaintiffs and a number of other individuals to other solitary confinement units, including Unit 4C in the North Jail, and Second West Maximum and the "E Dorms[4]" in the South Jail.  Defendant has not taken Plaintiffs Bracamonte and Chavez to a "yard" since they were moved to Unit 4C.

33.     People in solitary confinement, including Plaintiffs Chavez and Bracamonte, have submitted administrative grievances requesting to receive more out-of-cell time, including time on the yards.  Defendant denied these requests, telling Mr. Bracamonte, for example, that the one hour of outdoor time he received each week in Third West Max was a "courtesy," and he will not receive any additional time outdoors.

**B. Conditions in Solitary Confinement Are Unduly Harsh.**

34.     The impact on people of being locked down in their cells nearly all of the time is compounded by the harsh conditions and severe restrictions on all aspects of their lives.

35.     People in solitary confinement eat all of their meals inside their cells, usually sitting on their beds.

36.     Defendant shackles them every time they have contact with officers outside of their cells.   Officers frequently strip search them, in plain sight of other people, sometimes up to six times a day.  Their cells are thoroughly searched and their property is strewn about by officers a few times a week.

37.     Most people are locked in single-occupancy cells and cannot have normal human conversations with other individuals.  Their only avenues of communication are to speak through the vents in their cells, or to yell loudly enough for people to hear through

---

[4] The "E Dorms" are not actually dorms.  The unit consists of single cells similar in design to those in Third West Max.

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

the cell walls and doors.  Any communication with another suspected gang member, even just a greeting, may be and has been used by Defendant to justify retention in solitary confinement.

38.   While some people are double-celled, being locked up with a cellmate in a fifty square foot cell does not compensate for the severe isolation in solitary confinement. Instead, double-celling requires two strangers to live around-the-clock in intolerably cramped conditions, in a cell barely large enough for a single human being to stand or sit.

39.   The units are loud – guards' conversations echo throughout the unit all day.  Guards also open and close doors, and walk the unit with rattling keys and chains at least every hour for count, safety checks, or to transport individuals.  People yell from cell to cell in an attempt to communicate, and individuals with mental illness yell and scream incoherently or bang and rattle their cell doors.

40.   When family visits do occur, Defendant limits them to a total of two hours each week.  Defendant does not allow any physical contact whatsoever; visits occur behind a glass window, speaking over a telephone.  This means that individuals are prohibited from hugging or holding hands with visiting family members, children, or other loved ones.

41.   Despite the non-contact nature of family visits, Defendant strip searches people in some of the solitary confinement units before and after each visit.

42.   Property is tightly restricted.  Defendant allows individuals a total of only five books or magazines that family members can purchase for them, but correctional officers make it difficult, or impossible, for people to swap those books out when they are finished with them.  Defendant only allows them one to two cubic feet of property and prohibits individuals from putting up any decorations, drawings, photographs, or calendars on the walls in an attempt to humanize their living spaces.

43.   Defendant prohibits people in solitary confinement from using a broom, mop, sponge, rag, or clean towel to clean their cells, and does not itself maintain sanitary

conditions.  Defendant issues a bathing towel to each individual.  People who wish to keep their cell clean must use their sole personal bathing towel to wipe down the floors and surfaces, but they are reluctant to do so because correctional officers will not allow them to exchange the towel for a clean one until the regularly scheduled laundry exchange that occurs no more than once or twice a week.  In addition, as a result of being locked in solitary confinement, some people with mental illness throw or smear feces or urine.  When that happens, officers walk through and track feces and urine throughout the unit.  Due to Defendant's policy and practice of failing to maintain sanitary conditions, Plaintiffs are forced to live in areas covered in dirt, hair, blood, feces, urine, food remnants, and vermin, including large cockroaches.

**44.**    Defendant, through their policies and practices, are directly responsible for these harsh conditions and the related risk of harm.

## C. Defendant is Deliberately Indifferent to the Harmful Effects of Solitary Confinement.

**45.**    Penological and psychological experts have documented for over a century that people held in solitary confinement suffer from damaging physiological and psychological consequences.  All individuals are at risk of harm from these consequences, not just those with pre-existing health conditions.

**46.**    The most widely documented consequences of solitary confinement are its psychological effects.  These effects include (1) anxiety, ranging from persistent low-level stress to full-blown panic attacks; (2) depression, ranging from flat/low mood to major depression and feelings of hopelessness; (3) increased anger, ranging from irritability to outbursts of violence; (4) cognitive disturbances, ranging from decreases in concentration to total disorientation; (5) perceptual distortions, ranging from hypersensitivity to hallucinations affecting all five senses; (6) paranoia and psychosis, ranging from obsessional thoughts to full blown psychosis; and (7) increased risk of suicide and self-harm.  These effects frequently begin to manifest within hours or days of placement in

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

solitary confinement, worsening with time and causing permanent damage to individuals, especially those who linger in lockdown settings for months or years.  These effects are caused by the three main factors inherent in solitary confinement – social isolation, forced idleness and inactivity, and the oppressive security and surveillance procedures (and the weapons, hardware, and other paraphernalia that go along with them).

47.     The physiological consequences are partly due to physical manifestations of mental stress, and partly due to the extreme periods of inactivity, lack of natural light, and lack of fresh air in solitary confinement.  These consequences include gastro-intestinal and cardiovascular problems, migraine headaches, profound fatigue, deteriorating eyesight, back and joint pain, and aggravation of pre-existing medical conditions.

48.     People with mental health problems are especially susceptible to harm by prolonged isolation in solitary confinement.  These individuals are more sensitive and reactive to psychological stressors and emotional pain, and the direct negative psychological effects of solitary confinement mimic already existing symptoms of mental illness.   As a result, solitary confinement worsens their psychiatric conditions and intensifies their mental health related symptoms (including depression, psychosis, and self-harm).  In recognition of these well accepted facts, many correctional systems prohibit the placement of people with mental illness in solitary confinement, or at least limit its use to only when absolutely necessary (and only as a last resort) for a strictly limited timeframe that is augmented with significant amounts of out-of-cell time and increased access to mental health care.

49.     In light of the well-documented harms described above, there is an international consensus that the type of prolonged solitary confinement practiced by Defendant  violates international human rights norms and civilized standards of humanity and human dignity.  International human rights organizations and bodies, including the United Nations, have condemned indefinite or prolonged solitary confinement as a human rights abuse that can amount to torture.

50.     People in the Santa Clara County jails are suffering from the harms described above as a result of Defendant's policy and practice of locking them down 22 to 23 hours a day without adequate access to social interaction, fresh air, natural light, exercise, and stimulation.  Plaintiffs Chavez and Bracamonte, for example, are suffering from symptoms including hyper-sensitivity to stimuli, paranoia, anxiety, social withdrawal, emotional numbness, and feelings of overall deterioration.

51.     People with mental illness are especially vulnerable to the harms caused by solitary confinement and, therefore, should be excluded from those units.  Defendant fails to screen individuals for mental illness before locking them in solitary confinement. Defendant also fails to provide adequate mental health services to any individuals housed in solitary confinement.   Consequently, people with mental illness are experiencing suicidal ideation, hallucinations, delusions, and are acting out by making suicidal gestures, yelling and screaming, and smearing feces.  Instead of reducing the risk of harm by removing them from solitary confinement, correctional officers, in accordance with Defendant's policies and procedures, place them in restraint chairs and/or increase the amount of time they are locked in their cells.

52.     Individuals, including Plaintiffs Chavez and Bracamonte, who have managed to avoid complete mental decompensation have done so thus far by developing harmful responses that deaden feelings and emotions, and suppress anger.   They attempt to suppress that rage in order to avoid self-destruction, irresponsible acts of violence, or a mental breakdown.  Plaintiffs' attempts at suppression, in combination with their isolation, have led them to increasingly withdraw into themselves and become emotionally numb to the point of feeling "non-human."

53.     Defendant is aware of the risk of harm caused by its actions.  On June 25, 2015, the Prison Law Office sent a letter describing the risk of harm to individuals resulting from Defendant's policies and practices related to solitary confinement, and requested a meeting.  The Sheriff and other jail managers met with the Prison Law Office

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

but did not agree to significantly ameliorate the harmful conditions in solitary confinement.  The Prison Law Office sent another letter to Defendant on August 5, 2015, again describing the risk of harm, and requested a second meeting to negotiate an agreement to implement measures that would reduce that risk of harm.

54.    Numerous individuals, including Plaintiffs Chavez and Bracamonte, have also repeatedly requested, through internal jail request forms and grievances, to be removed from solitary confinement because of harm caused by the inhumane conditions. Defendant has not moved any people out of solitary confinement in response to these requests.    Community organizations, including family members, have met with and contacted Sheriff's Department staff and members of the Board of Supervisors repeatedly about conditions in solitary confinement.  Defendant has refused to ameliorate the harsh conditions in response to their concerns.

## II.    People are Locked in Solitary Confinement Even Though They Pose No Threat to Safety or Security and Have No Meaningful Opportunity to Challenge Their Placement.

55.    Defendant locks people in solitary confinement for indefinite terms based on a classification system that their own consultants have called "questionable" because it lacks validity, reliability, and integrity.  Defendant does not make decisions about where individuals should be housed using standardized classification policies and procedures. Valid and reliable classification policies and procedures are based on quantitative and objective factors, focused on people's behaviors, that identify their custody and security requirements.  Defendant does not use such classification policies and procedures.

56.    In July 2014, Defendant hired a correctional consulting firm, MGT of America, Inc. (MGT), to evaluate jail conditions and systems.  In December 2014, MGT produced a report that, among other things, excoriated Defendant's jail classification system.  It found the system to be exceptionally complicated and highly subjective and concluded that jail staff is not appropriately trained on the system.  MGT warned that the system "creates a potential risk of costly mistakes."  MGT also found that Defendant does

not consider individuals' actual institutional behaviors when classifying them.   For example, nearly 20% of people identified as maximum security are classified that way due only to their criminal charges and not their behaviors in the jail, which MGT found to be unacceptable.

57.   Defendant maintains this system even though there is no penological basis for doing so.   Defendant locks people in solitary confinement who pose no legitimate security threat to staff or other prisoners.   For example, Mr. Chavez has been in custody since 2011, but has never been violent or charged with any serious rule violations in the jail.   Defendant has housed him in various locations with varying levels of restrictions throughout the jail without incident.   Indeed, for two years jail officials gave him special privileges as a jail trustee because of his good behavior.   Then, in November 2014, Defendant moved him to solitary confinement in Third West Max and stripped him of his trustee assignment even though he continued to remain discipline free.

58.   Other jurisdictions, including the California Department of Corrections and Rehabilitation (CDCR), have ended the practice of housing prisoners in solitary confinement just because they are suspected gang members.   CDCR prisoners housed in the most restrictive settings have significantly more out-of-cell time than people in Defendant's solitary confinement cells.

59.   Defendant also has a policy and practice of locking people in solitary confinement who have only been charged with minor rules violations that do not justify such restrictive housing.   For example, the County has locked a woman in solitary confinement for two and a half years even though her most serious offenses have been talking back to correctional officers or yelling and banging on her cell door with other individuals in the unit.

60.   Defendant also has a policy and practice of locking people in solitary confinement without notice, explanation, written reasons for the decision, or an opportunity to present witnesses or documentary evidence to challenge the decision.   For

example, correctional officers told Mr. Bracamonte that he was housed in Third West Max because of his participation in an alleged "gang assault" over two years ago, where his only involvement was being present in the dayroom when the purported assault took place. Defendant has not presented Mr. Bracamonte with any evidence that he assaulted, or planned to assault, another person, and has denied him any opportunity to challenge his placement.

61.     There is no meaningful avenue to contest an incorrect placement decision. Several people, including Plaintiffs, have attempted to challenge classification decisions through the grievance system, and the County's only response is that they have been "properly housed" and they will not be moved.  The County has told others that their classification status will be reviewed every 30 days, but individuals cannot participate in this review process and the reviews rarely, if ever, result in changes to classification status for those in solitary confinement.  Such reviews are therefore meaningless.

62.     Defendant's policy and practice retains people in solitary confinement arbitrarily despite their good behavior, in reliance on opaque classification decisions, and without reasonable penological justification.

### III.    Class Allegations

63.     Plaintiffs Brian Chavez and Brandon Bracamonte bring this action on their own behalves and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all people in Defendant's custody who are or will in the future be locked in their cells for 22 hours a day or more for a period of three weeks or longer.  By locking people in prolonged solitary confinement, Defendant is depriving hundreds of class members at least one basic human need including physical exercise, fresh air, sunlight, normal human contact, meaningful activity, and environmental stimulation.   In addition, all class members are at risk of, and some are already suffering from, significant mental and physical harm.  While the exact nature of those harms may differ in some respects for each prisoner, the source of the harm complained of here is the same – namely,

Defendant's policies and practices in placing the class of prisoners for prolonged periods of time in conditions of confinement are shown to cause serious mental and physical harm in violation of their Fourteenth Amendment rights.

64. Class members are also being held in solitary confinement for no legitimate security purpose, and/or without (1) a hearing with advance written notice (except in case of a genuine emergency) before initial placement, and/or (2) the opportunity to present witnesses and documentary evidence, and/or (3) written reasons for the decision, and/or (4) counsel-substitute for an illiterate or disabled inmate or in a case with complex issues, and/or (5) meaningful review of their placements in violation of the Due Process Clause of the Fourteenth Amendment.

65. There are questions of law and fact common to the class including whether Defendant violates the Due Process Clause of the Fourteenth Amendment by its policy and practice of (1) denying individuals' basic human needs by locking them in their cells for 22 to 24 hours a day for periods of three weeks or longer; (2) locking people in solitary confinement for minor rules violations or because they are suspected gang members; and (3) locking people in solitary confinement without a hearing, written notice, an opportunity to defend themselves through witness or documentary evidence, or meaningful review of their placements.

66. Since there are at least hundreds of class members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for Defendant.

67. Defendant has acted and failed to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

68. Plaintiffs' claims are typical of the claims of the class, since their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theory of law as the class's claims.

1   **69.**   The named Plaintiffs, through counsel, will fairly and adequately protect the

2   interests of the class.  Plaintiffs do not have any interests antagonistic to the plaintiff class.

3   Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and

4   omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in civil

5   rights litigation, prisoners' rights litigation, and complex class action litigation.

**CLAIMS FOR RELIEF**

**First Cause of Action**
**(Fourteenth Amendment - Cruel and Unusual Conditions)**

9   **70.**   Plaintiffs incorporate by reference each and every allegation contained in the

10   preceding paragraphs as if set forth fully herein.

11   **71.**   By the policies and practices described herein, Defendant has deprived and

12   continues to deprive Plaintiffs and the class of the minimal civilized measure of life's

13   necessities, and has violated their basic human dignity and their right to be free from cruel

14   and unusual conditions under the Fourteenth Amendment to the United States Constitution

15   for each of the reasons set forth below.

16   **A. Deprivation of Basic Human Need**

17   **72.**   First, the effect of prolonged confinement constitutes a serious deprivation of

18   at least one basic human need, including, but not limited to, normal human contact,

19   environmental and sensory stimulation, mental and physical health, physical exercise,

20   fresh air, sunlight, and meaningful activity.

21   **B. Imposition of Serious Psychological and Physical Injury, Pain and Suffering**

22   **73.**   Second, prolonged exposure to these deprivations of basic human needs is

23   currently imposing permanent psychological and physical injury on Plaintiffs and the class

24   they represent.

25   **74.**   In addition to Plaintiffs' current psychological and physical pain, the

26   likelihood that Plaintiffs and the class will remain in solitary confinement for the

27

28

19

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

foreseeable future subjects Plaintiffs and the class they represent to a significant risk of debilitating and permanent mental illness and physical harm.

### C. Deprivation of Human Dignity in Violation of Contemporary Standards of Human Decency

**75.**     Third, Defendant's continuation of class members' solitary confinement for many months or years under the debilitating and extreme conditions strips human beings of their basic dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual conditions prohibited by the Fourteenth Amendments to the United States Constitution.

### D. Unlawful Punishment

**76.**     Fourth, Defendant has no legitimate penological interest in retaining Plaintiffs and the class indefinitely in the debilitating conditions of solitary confinement simply because of their charges, gang status, or minor rules violations.   Accordingly, Defendant's policy of indefinite and prolonged solitary confinement constitutes unlawful punishment of individuals who have not been convicted.

### E. Defendant's Deliberate Indifference

**77.**     The policies and practices complained of herein have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity.

**78.**     Defendant has been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**79.**     It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.   Moreover, Defendant has repeatedly been made aware, through administrative grievances and written complaints, that class members are currently experiencing, or are at risk of, significant and lasting injury.   Defendant has been deliberately indifferent to the class members' pain and suffering.

**Second Cause of Action**
**(Fourteenth Amendment – Procedural Due Process)**

**80.**    Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-69 as if set forth fully herein.

**81.**    Defendant's policy of indefinite and prolonged solitary confinement subjects Plaintiffs and the class to a significant deprivation of liberty without any procedural safeguards.

**82.**    Plaintiffs and the class have a liberty interest, conferred by statewide regulations, in not being confined in solitary confinement unless it is necessary to ensure the safety and security of staff and other individuals.  *See* CAL. CODE REGS. tit. 15, §§ 1050, 1053.

**83.**    The conditions and the duration of Defendant's placement of Plaintiffs and class members in solitary confinement constitute an atypical and significant hardship as compared with the ordinary incidents of jail life because of the harsh and isolated conditions and the lengthy duration of confinement in those conditions.  People in solitary confinement, as compared to other individuals in the jail, have significantly less or no access to social interaction, environmental stimulation, programs and activities, physical exercise, personal property, sunlight, and fresh air.  They are also subjected to, as compared to other individuals in the jail, significantly more oppressive security measures, including cell searches, strip searches, and restraints.

**84.**    Because prolonged placement in solitary confinement constitutes a significant and atypical hardship, by the policies and practices described herein, Defendant has deprived Plaintiffs and class members of a liberty interest without due process of law by denying them (1) a hearing with advance written notice before initial placement in solitary confinement, (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision, (4) counsel-substitute for an illiterate or disabled individuals or in a case with complex issues, and (5) meaningful and timely periodic review of their continued long-term and indefinite detention in solitary confinement and

21

meaningful notice of what they must do to earn release, in violation of the Fourteenth Amendment to the United States Constitution.

**85.**     The costs to Defendant of providing such procedural safeguards would be minimal, and any such costs are outweighed by the great risk of erroneous deprivation of liberty that exists under Defendant's current policies and practices.

**86.**     The policies and practices complained of herein have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity.

**PRAYER FOR RELIEF**

**87.**     Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendant as alleged herein, unless Plaintiffs are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under the Constitution of the United States.

**88.**     WHEREFORE, Plaintiffs on behalf of themselves and the class they represent, request that this Court grant them the following relief:

A.  Declare the suit is maintainable as a class action pursuant to Federal Rule of Civil procedure 23(a) and 23(b)(1) and (2);

B.  Adjudge and declare that the conditions, acts, omissions, policies, and practices of Defendant and its agents, officials, and employees are in violation of the rights of Plaintiffs and the class they represent under the Fourteenth Amendment to the U.S. Constitution;

C.  Order Defendant, its agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the class suffer due to Defendant's policy and practice of locking people in

their cells for 22 hours or more a day for three weeks or longer, to ensure that people are not housed in restrictive housing without a legitimate penological purpose, and to provide a meaningful opportunity to be heard and to challenge classification decisions resulting in solitary confinement.  Defendant's plan must include at a minimum the following:

1.  Elimination of the conditions of confinement for people in solitary confinement so that individuals are no longer incarcerated under conditions of isolation, sensory deprivation, lack of social and physical human contact, unsanitary conditions, and environmental deprivation;

2.  The release from restricted housing for those individuals who do not pose a legitimate security threat;

3.  Standardized classification policies and procedures based on objective and quantitative factors that focus on individuals' in-jail behavior; and

4.  Provision of (1) a hearing with advance written notice before initial placement in solitary confinement, (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision, (4) counsel-substitute for an illiterate or disabled person or in a case with complex issues, and (5) meaningful and timely periodic review of their continued long-term and indefinite detention in solitary confinement.

E.   Award Plaintiffs, pursuant to 42 U.S.C. § 1988, the costs of this suit and reasonable attorneys' fees and litigation expenses;

F.   Retain jurisdiction of this case until Defendant has fully complied with the orders of this Court, and there is a reasonable assurance that Defendant will continue to comply in the future absent continuing jurisdiction; and

G.  Award such other and further relief as the Court deems just and proper.

Dated:  November 18, 2015

PRISON LAW OFFICE

By: /s/ Kelly Knapp

DONALD SPECTER (SBN 83925)
KELLY KNAPP (SBN 252013)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

COOLEY LLP

By: /s/ Jessica Valenzuela Santamaria

JESSICA VALENZUELA SANTAMARIA
(SBN 220934)
JEFFREY W. WALKER (SBN 280505)
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000

By: /s/ Kendall Dawson Wasley

KENDALL DAWSON WASLEY (SBN
252294)
PMB 233
1520 E. Covell Blvd.
Davis, CA 95615
Telephone: (408) 827-5024

*Attorneys for Plaintiffs*

124180252

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**