DONALD SPECTER (SBN 83925)
dspecter@prisonlaw.com
KELLY KNAPP (SBN 252013)
kknapp@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

JESSICA VALENZUELA SANTAMARIA
(SBN 220934) jsantamaria@cooley.com
JEFFREY W. WALKER (SBN 280505)
jwalker@cooley.com
ADDISON M. LITTON (SBN 305374)
alitton@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000

KENDALL DAWSON WASLEY(SBN
252294) kendall@dawsonwasleylaw.com
PMB 233
1520 E. Covell Blvd.
Davis, CA 95615
Telephone: (408) 827-5024

Attorneys for Plaintiffs Brian Chavez
and Brandon Bracamonte

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CHAVEZ and BRANDON BRACAMONTE, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>COUNTY OF SANTA CLARA,<br><br>Defendant. | Case No. 1:15-cv-05277-NJV<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## NATURE OF THE ACTION

1.      Santa Clara County isolates hundreds of men and women in tiny, filthy concrete jail cells as small as six by seven feet, and keeps them locked in these cells for 22 to 24 hours of every day, permitting them scant human contact, sunlight, fresh air, exercise, and environmental stimulation for months or even years at a time.  The County does not only impose these harsh conditions on people who have been sentenced to jail terms; it also subjects people who have not been convicted and are simply awaiting a court date to the same treatment.

2.      The County locks up, indefinitely, hundreds of individuals in these cramped jail cells at any given time.  The County only allows them to go to small "yards" that are enclosed within tall, solid concrete walls and steel mesh for a few hours a week, which is their only access to fresh air and sunlight.  For almost all of the remaining hours, the County forces individuals to sit idle locked in their cells, often for 47 or more hours at a time.

3.      Santa Clara County, by its policy and practice of isolating people in these inhumane conditions, is subjecting individuals to serious psychological and physiological harm.  Many individuals are already experiencing perceptible harm, including anxiety, depression, social withdrawal, paranoia, agitation, and suicidal ideation.  People with pre-existing mental illness are suffering from more acute symptoms as a result of these policies and practices.  Jail officials have consistently denied or ignored individuals' administrative grievances and written requests to be removed from isolation.  The County is deliberately indifferent to the serious risk of harm caused by these conditions.

4.      Santa Clara County has no legitimate justification for these inhumane conditions.  The classification system that the County uses to identify which individuals to isolate in "solitary confinement" is, in the words of the County's own consultants, unreliable, invalid, and without integrity.  Many people currently in solitary confinement have not violated jail rules in years, if ever, and the County has never provided any meaningful explanation for housing them in these harsh conditions.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**5.** Santa Clara County also, by policy and practice, subjects individuals to significant harm from the excessive use of force. Correctional officers inflict serious physical injury on people under their supervision, sometimes leading to their death, when it is not necessary to control their behavior or maintain order in the jails. These patterns of excessive force occur because the County's policies and procedures, supervision, training, investigation, and discipline are deficient.

**6.** The County, by policy and practice, fails to provide adequate medical, mental health, and dental care to people in the jails. There are intolerable delays in clinical appointments and medication delivery, there is no therapy for people with serious mental illness, the suicide prevention measures are dangerously ineffective, and the only readily available dental services are tooth extractions and temporary fillings. These deficiencies and others result in preventable injuries and death.

**7.** Plaintiffs Brian Chavez and Brandon Bracamonte, and the class they represent, seek a declaration that Santa Clara County's ongoing practices violate their constitutional rights, and seek injunctive relief compelling Defendant to cease holding people in the inhumane conditions of solitary confinement for prolonged periods, to provide individuals with meaningful notice and opportunities to challenge decisions to place them in solitary confinement, to provide constitutionally adequate healthcare, and to cease the unnecessary and excessive use of force.

## JURISDICTION

**8.** The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**9.** The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; and 42 U.S.C. § 1983.

1

**VENUE**

2       **10.**     Venue is proper in the Northern District of California under 28 U.S.C. §

3   1391(b) because a substantial part of the events or omissions giving rise to the claims

4   brought by Plaintiffs and the class have occurred in this District and Defendant is located

5   in this District.

6                       **INTRADISTRICT ASSIGNMENT**

7       **11.**     Assignment to any division within this district is proper pursuant to Civil

8   L.R. 3-2(c) since this is a prisoner civil rights action.  The events giving rise to this claim

9   arise in the County of Santa Clara.

10                               **PARTIES**

11  **Plaintiffs**

12      **12.**     Plaintiff Brian Chavez is a pretrial detainee in the Santa Clara jails in

13  custody of Defendant Santa Clara County.   He was arrested in November 2011 on

14  narcotics and conspiracy charges, and has been subsequently indicted on conspiracy,

15  narcotics, and gang charges.   He has not been convicted of any of these charges.

16  Defendant has never charged Mr. Chavez with any serious jail infractions, and he has not

17  engaged in any violent behaviors since he came to the jail four years ago.  Santa Clara

18  officials housed him in various locations within the jail facilities, and appointed him a jail

19  "trustee."   Jail officials appoint as trustees only those individuals who have consistently

20  demonstrated good behavior, and give them special privileges and more time out of their

21  cells than other people.  He remained a trustee until November 2014 when, without any

22  explanation, notice, hearing, or opportunity to challenge the decision, Defendant stripped

23  Mr. Chavez of his assignment as jail trustee and moved him to solitary confinement in the

24  South Jail Third West Maximum Unit ("Third West Max").  Mr. Chavez stayed in Third

25  West Max until November 4, 2015, when Defendant moved him to another solitary

26  confinement unit in the North Jail again without any explanation.  In response to Mr.

27  Chavez's administrative grievances requesting to be moved to less restrictive housing,

28  Defendant has told him only that he is "properly housed" and that his file will be reviewed

3

1   every 30 days.  Defendant has never allowed Mr. Chavez to participate in such reviews, if,

2   indeed, they have happened, or informed him of their outcome.

3   **13.**   Plaintiff Brandon Bracamonte is a convicted prisoner in the Santa Clara jails

4   in custody of Defendant Santa Clara County.  He was arrested in April 2012 for carjacking

5   and was subsequently indicted on conspiracy, robbery, and gang charges.  Mr. Bracamonte

6   was convicted of carjacking, and is awaiting trial on the remaining charges.  The County

7   has housed him in various locations and security levels within the jail facilities, including

8   in dorms and with cellmates, and has never found him guilty of any serious rule violations

9   or violent behaviors.  Like Mr. Chavez, jail officials appointed Mr. Bracamonte as a jail

10  "trustee."  In August 2013, the County alleged that Mr. Bracamonte participated in a "gang

11  assault," but did not formally charge him with a violation of jail rules.  Similarly, the

12  district attorney's office concluded there was no credible evidence supporting the

13  allegations, and so dismissed all charges in a related criminal case.  One to two months

14  after that unsubstantiated incident, Defendant moved him to Second East Maximum

15  without any explanation, notice, or opportunity to challenge the decision.  From November

16  2014 until November 4, 2015, Defendant locked him in solitary confinement in Third West

17  Max.  On November 4, 2015, Defendant moved him to another solitary confinement unit

18  in the North Jail without any explanation.  In response to Mr. Bracamonte's administrative

19  grievances requesting to be moved to less restrictive housing, Defendant told him that he

20  must be housed in solitary confinement because of the alleged "gang assault" in August

21  2013 for which he was never found guilty, and which he had no opportunity to challenge.

22  **14.**   From November 2014 until November 4, 2015, Defendant locked Mr.

23  Chavez and Mr. Bracamonte in separate six by seven foot windowless cells for at least 23

24  hours a day in Third West Max.  The County exacerbated the conditions of these

25  exceedingly small cells by failing to keep them clean, thereby forcing Mr. Bracamonte and

26  Mr. Chavez to live in areas covered in filth and grime.  Defendant typically only allowed

27  them out of their cells every other day, which means they often spent more than 48

28  consecutive hours locked down.  Defendant never took them to the "yard," and denied

them any access to natural light or fresh air, for seven months (November 2014 - June 2015).  In July 2015, Defendant allowed them one hour a week in a caged enclosure on the "yard" before sunrise.

15.     Though the County only allowed them visits from their families infrequently, when it did permit such visits, Defendant took Mr. Chavez and Mr. Bracamonte out of their cells for a maximum of two hours a week for non-contact visits through a glass window, speaking over a phone.  The only other time the County allowed them out of their cells was when correctional officers moved them, alone, to another six by seven foot empty cell and adjacent stand-up shower every other day for one hour.  Defendant always chained and shackled them and regularly strip searched them before they returned to their cells.

16.     On November 4, 2015, Defendant moved Mr. Chavez, Mr. Bracamonte, and a number of other individuals from Third West Max to another solitary confinement unit (4C) in the North Jail.[1]  The cells in this unit measure approximately eight by ten feet. Within a few days of this action being filed, Defendant began occasionally letting Mr. Chavez and Mr. Bracamonte out of their cells into the dayroom for three-hour blocks of time a few times a week where there are no activities or furniture other than a plastic chair. This three-hour block of time is often offered from 11 p.m. to 2 a.m. when there is nothing to do but sit in silence to avoid waking others who are sleeping.  Individuals in other North Jail solitary confinement units, and some individuals in Unit 4C, only receive one hour out of their cells every 48 hours.

17.     As a result of his prolonged isolation in solitary confinement, Mr. Chavez is suffering from debilitating psychological damage.  Although he is only 35 years old, he is preoccupied with fears of dying alone and unnoticed in his cell.  He withdraws from his

---

[1] This move occurred three days before members of a Blue Ribbon Commission were scheduled to tour the jail on November 7, 2015.  The Blue Ribbon Commission was formed by the County Board of Supervisors to improve custody operations after three correctional officers were charged, on September 8, 2015, with murdering a mentally ill pretrial detainee held in the North Jail.

FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

rare opportunities for social interaction, including when his family and friends attempt to emotionally connect with him through occasional jail visits and letters.  He is quickly and easily irritated by minor noises such as someone tapping their fingers on a nearby surface. He is often disoriented and confused about the time of day.  Defendant has failed to provide Mr. Chavez with any mental health treatment to treat these symptoms.

**18.**    As a result of his prolonged isolation in solitary confinement, Mr. Bracamonte is also suffering from debilitating psychological and physiological damage. He suffers from insomnia and chronic fatigue.  He suffers from anxiety that causes him to pace back and forth, to the extent possible, in his small cell.  Before the County sent Mr. Bracamonte to solitary confinement, he passed the time by reading books.  Now he cannot read more than a few paragraphs without losing focus and needing to start over.  He is hypervigilant about certain noises; for instance, he jumps to his feet when he hears alarms, officers running, or cell doors popping open because he fears someone is coming to assault him.  He feels numb and distant when he speaks to his family, and he is no longer able to emotionally connect with his wife and children.  Mr. Bracamonte submitted a written request for mental health care to treat these symptoms in May 2015, but Defendant failed to review and respond to his request until seven months later.  To date, he has not received any meaningful mental health treatment.

**19.**    Mr. Chavez and Mr. Bracamonte have exhausted available administrative remedies.  They brought grievances challenging the conditions in solitary confinement, and their assignment to solitary confinement, but Defendant denied these grievances.

**Defendant**

**20.**    Defendant County of Santa Clara operates three jail facilities – the Main Jail Facility (including the South and North Jails), Elmwood Women's Correctional Complex, and the Elmwood Men's Correctional Complex – that incarcerate over 3,500 individuals. The County is responsible for ensuring that the basic human needs of individuals in its custody are met, and for ensuring that individuals are not at risk of serious harm, including by providing appropriate funding, oversight, and corrective action to ensure adequate

conditions.  The County is also responsible for ensuring that jail policies and practices do not violate individuals' substantive and procedural due process rights.

### FACTUAL ALLEGATIONS

**I.     Santa Clara County Locks People in Inhumane Conditions for Months or Years at a Time.**

**21.**    Defendant, by policy and practice, locks hundreds of people in small cells for at least 23 hours a day for months or years at time.  The United States Department of Justice defines "solitary confinement" as the "state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others."[2]  Over the last several decades, mental health and correctional experts have documented the harmful effects of prolonged solitary confinement.  Prolonged solitary confinement is defined as any period of time over three to four weeks.[3]  Common side-effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.  *Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)).  Defendant is deliberately indifferent to the substantial and obvious risk of harm caused by its policy and practice of locking people in solitary confinement for prolonged periods of time.

**A.  Defendant locks people in cramped cells for at least 23 hours a day.**

**22.**    Defendant locks people in solitary confinement (including Plaintiffs Chavez and Bracamonte) in various areas of the jail, including the maximum security,

---

[2] U.S. Department of Justice, Investigation of State Correctional Institution at Cresson, May 13, 2013, Attachment #7, p. 5, available at
http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf  (last viewed on October 15, 2015).

[3] American Psychiatric Association, Position statement on segregation of people with mental illness (2012), available from
http://www.psychiatry.org/File%20Library/Learn/Archives/Position-2012-Prisoners-Segregation.pdf. (last viewed on November 2, 2015).

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

administrative segregation, and psychiatric housing units, for 23 hours or more a day. Most of these individuals are locked alone in gray concrete cells that vary in size from approximately six by seven to eight by ten feet. Defendant locks some of these individuals in these tiny cells with a cellmate.

23. In the South Jail, which was built in 1956, the cells have no windows. The doors to most of the cells are bars, but there is no visibility from one cell into another cell. The cells only have room for a bed, writing table and stool, and a combined toilet and sink. The cells have no access to fresh air or natural light, and no clocks.

24. In the more modern North Jail and Elmwood facilities, the gray concrete cells are slightly bigger (eight by ten feet) and have the same limited furnishings, but some have small windows to the outside. The doors are solid metal with a food port and a small rectangular window with a view toward a dayroom. There is no fresh air in the cells and only minimal natural light filters through the glass in the exterior window.

25. Conditions in the Third West Maximum Unit ("Third West Max"), located in the antiquated and worn down South Jail, are even more austere. This unit has the smallest cells, and there is no room for a writing table or stool. The doors are solid metal, with a small rectangular window and food port that faces out to a dim, narrow hallway. There is no access to fresh air or natural light, and there are no clocks.

26. Defendant typically only allows people in solitary confinement out of their cells for "recreation" three hours a week; a few units periodically receive four hours a week. "Recreation" consists of time spent in a dayroom, "yard," or another cell. Defendant prohibits them from attending any structured group recreational, religious, educational, or vocational programs.

27. In the South Jail, the only access to fresh air and natural light is on the "sundeck," where Defendant locks individuals alone in cages that measure approximately seven by fifteen feet. The cages are located in an area completely enclosed by tall concrete walls and steel mesh overhead. An individual on the "sundeck" can see the sky and the tops of nearby buildings, but nothing else. There is nothing in the cages – no place to sit,

no exercise equipment, no toilet, and no access to water.  Additionally, there is no accommodation for rain; therefore, when it is raining the individual sits in the rain with no access to dry clothes upon returning to his cell.  Nonetheless, some individuals choose to go to this "yard" just to get out of their cells and to interact with people in the other cages. There are no dayrooms.

28.     In the North Jail, people can go alone to a "yard," which is entirely enclosed by concrete walls and steel mesh, with no seating, equipment, or activities.  In the "yards" connected to the dayrooms, individuals can move freely back and forth during the regularly scheduled time they are allowed out of their cells, always alone.  In the units where the "yards" are separate from the dayrooms, people must ask the housing unit officers to go to the "yard" during their out-of-cell time.  If the housing unit officers decide to grant their requests, the individuals must be chained and shackled pursuant to the County's policies, and, as such, Defendant sometimes denies their requests because transporting them is burdensome.  People in the North Jail units are only given 25 minutes to one hour of out-of-cell time a day, and within this time they must also shower, make phone calls, and use grooming supplies (e.g., razors, nail clippers, hair clippers, etc.).  This is also the only time Defendant allows individuals to interact face-to-face with other people through the glass windows of closed cell doors.  Thus, many individuals do not use the "yard" because there is not enough time to go there and fulfill their other basic needs.

29.     In many of the Elmwood cell-units, the outdoor "yards" are similar in design to those in the North Jail.  Defendant allows people out of their cells to use the "yard" and dayroom one hour every other day.

30.     All but a few of the Elmwood and North Jail dayrooms are stark and bare. They do not have any tables, seating, or recreational activities other than televisions.

31.     In Elmwood, an instructor comes once a week to teach yoga to women in solitary confinement.  However, the women are not let out of their cells for this class. Instead, the instructor stands in the dayroom.

32.     From November 2014 until the end of June 2015, Defendant never took

9

individuals in Third West Max, including Plaintiffs, to a "yard" or "sundeck."  Instead, Defendant gave them "recreation" time in an empty cell the individuals in solitary confinement have named "The Box."  The Box is a six by seven foot windowless cell that is empty except for a phone and a toilet.  The door to the cell is left open so that individuals can come and go into the small stand-up shower immediately adjacent to the cell.  There is no place to sit, not enough room to do any meaningful exercise, and the cell and shower are filthy.  Defendant took people to The Box every other day for one hour, which was their only time to shower and use the phone.  However, due to the schedule created and maintained by correctional officers, the single hour in The Box was regularly late at night.  When offered at this time, people sometimes refused because they could not call their families or attorneys at that late hour, and when they were done showering there was nothing left to do but stand there and wait until the hour was up.

33.    On June 25, 2015, the Prison Law Office sent a letter to the Sheriff notifying her, among other things, that she was obligated to provide outdoor time to people in Third West Max.  After receiving the June 25, 2015 letter, the County began taking people from this unit to the "sundeck" one hour a week.  Before that, these individuals had not been outside in *seven months.*

34.    On November 4, 2015, Defendant moved Plaintiffs and a number of other individuals to other solitary confinement units, including Unit 4C in the North Jail, and Second West Maximum and the "E Dorms"[4] in the South Jail.

35.    People in solitary confinement, including Plaintiffs Chavez and Bracamonte, have submitted administrative grievances requesting to receive more out-of-cell time, including time on the "yards."  Defendant denied these requests, telling Mr. Bracamonte that the one hour of outdoor time he received each week in Third West Max was a "courtesy," and he will not receive any additional time outdoors.

---

[4] The "E Dorms" are not actually dorms.  The unit consists of single cells similar in design to those in Third West Max.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1    **B. Conditions in Solitary Confinement Are Unduly Harsh.**

2    **36.**    The impact on people of being locked down in their cells nearly all of the

3    time is compounded by the harsh conditions and severe restrictions on all aspects of their

4    lives.

5    **37.**    People in solitary confinement eat all of their meals inside their cells, usually

6    sitting on their beds.

7    **38.**    Defendant shackles them every time they have contact with officers outside

8    of their cells.   Officers frequently strip search them, in plain sight of other people,

9    sometimes up to six times a day.  Their cells are thoroughly searched and their property is

10   strewn about by officers a few times a week.

11   **39.**    Most people are locked in single-occupancy cells and cannot have normal

12   human conversations with other individuals.  Their only avenues of communication are to

13   speak through the vents in their cells, or to yell loudly enough for people to hear through

14   the cell walls and doors.  Any communication with another suspected gang member, even

15   just a greeting, may be and has been used by Defendant to justify retention in solitary

16   confinement.

17   **40.**    While some people are double-celled, being locked up with a cellmate in a

18   fifty square foot cell does not compensate for the severe isolation in solitary confinement.

19   Instead, double-celling requires two strangers to live around-the-clock in intolerably

20   cramped conditions, in a cell barely large enough for a single human being to stand or sit.

21   **41.**    The units are loud – guards' conversations echo throughout the unit all

22   day.  Guards also open and close doors, and walk the unit with rattling keys and chains at

23   least every hour for count, safety checks, or to transport individuals.  People yell from cell

24   to cell in an attempt to communicate, and individuals with mental illness yell and scream

25   incoherently or bang and rattle their cell doors.

26   **42.**    When family visits do occur, Defendant limits them to a total of two hours

27   each week.  Defendant does not allow any physical contact whatsoever; visits occur behind

28   a glass window, speaking over a telephone.  This means that individuals are prohibited

1   from hugging or holding hands with visiting family members, children, or other loved

2   ones.

3        **43.**    Despite the non-contact nature of family visits, Defendant strip searches

4   people in some of the solitary confinement units before and after each visit.

5        **44.**    Property is tightly restricted.  Defendant allows individuals a total of only

6   five books or magazines that family members can purchase for them, but correctional

7   officers make it difficult, or impossible, for people to swap those books out when they are

8   finished with them.  Defendant only allows them one to two cubic feet of property.

9        **45.**    Defendant prohibits people in solitary confinement from using a broom,

10   mop, sponge, rag, or clean towel to clean their cells, and does not itself maintain sanitary

11   conditions.  Defendant issues a bathing towel to each individual.  People who wish to keep

12   their cell clean must use their sole personal bathing towel to wipe down the floors and

13   surfaces, but they are reluctant to do so because correctional officers will not allow them to

14   exchange the towel for a clean one until the regularly scheduled laundry exchange that

15   occurs no more than once or twice a week.  In addition, as a result of being locked in

16   solitary confinement, some people with mental illness throw or smear feces or urine.

17   When that happens, officers walk through and track feces and urine throughout the unit.

18   Due to Defendant's policy and practice of failing to maintain sanitary conditions, Plaintiffs

19   are forced to live in areas covered in dirt, hair, blood, feces, urine, food remnants, and

20   vermin, including large cockroaches.

21        **46.**    Defendant, through its policies and practices, is directly responsible for these

22   harsh conditions and the related risk of harm.

23       **C. Defendant is Deliberately Indifferent to the Harmful Effects of Solitary**

24          **Confinement.**

25        **47.**    Penological and psychological experts have documented for over a century

26   that people held in solitary confinement suffer from damaging physiological and

27   psychological consequences.  All individuals are at risk of harm from these consequences,

28   not just those with pre-existing health conditions.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**48.** The most widely documented consequences of solitary confinement are its psychological effects. These effects include (1) anxiety, ranging from persistent low-level stress to full-blown panic attacks; (2) depression, ranging from flat/low mood to major depression and feelings of hopelessness; (3) increased anger, ranging from irritability to outbursts of violence; (4) cognitive disturbances, ranging from decreases in concentration to total disorientation; (5) perceptual distortions, ranging from hypersensitivity to hallucinations affecting all five senses; (6) paranoia and psychosis, ranging from obsessive thoughts to full blown psychosis; and (7) increased risk of suicide and self-harm. These effects frequently begin to manifest within hours or days of placement in solitary confinement, worsening with time and causing permanent damage to individuals, especially those who linger in lockdown settings for months or years. These effects are caused by the three main factors inherent in solitary confinement – social isolation, enforced idleness and inactivity, and the oppressive security and surveillance procedures (and the weapons, hardware, and other paraphernalia that go along with them).

**49.** The physiological consequences are partly due to physical manifestations of mental stress, and partly due to the extreme periods of inactivity, lack of natural light, and lack of fresh air in solitary confinement. These consequences include gastro-intestinal and cardiovascular problems, migraine headaches, profound fatigue, deteriorating eyesight, back and joint pain, and aggravation of pre-existing medical conditions.

**50.** People with mental health problems or intellectual disabilities are especially susceptible to harm by prolonged isolation in solitary confinement. These individuals are more sensitive and reactive to psychological stressors and emotional pain, and the direct negative psychological effects of solitary confinement mimic already existing symptoms of mental illness. As a result, solitary confinement worsens their conditions and intensifies mental health related symptoms (including depression, psychosis, and self-harm). In recognition of these well accepted facts, many correctional systems prohibit the placement of people with mental illness or intellectual disabilities in solitary confinement, or at least limit its use to only when absolutely necessary (and only as a last resort) for a strictly

limited timeframe that is augmented with significant amounts of out-of-cell time and increased access to mental health care.

51.    In light of the well-documented harms described above, there is an international consensus that the type of prolonged solitary confinement practiced by Defendant violates international human rights norms and civilized standards of humanity and human dignity.  International human rights organizations and bodies, including the United Nations, have condemned indefinite or prolonged solitary confinement as a human rights abuse that can amount to torture.

52.    People in the Santa Clara County jails are suffering from the harms described above as a result of Defendant's policy and practice of locking them down 22 to 23 hours a day without adequate access to social interaction, fresh air, natural light, exercise, and stimulation.  Plaintiffs Chavez and Bracamonte, for example, are suffering from symptoms including hyper-sensitivity to stimuli, paranoia, anxiety, social withdrawal, emotional numbness, and feelings of overall deterioration.

53.    People with mental illness or intellectual disabilities are especially vulnerable to the harms caused by solitary confinement and, therefore, should be excluded from those units.  Defendant fails to screen individuals for mental illness or intellectual disabilities before locking them in solitary confinement.  Defendant also fails to provide adequate mental health services to any individuals housed in solitary confinement.  Consequently, people with mental illness or intellectual disabilities are experiencing suicidal ideation, hallucinations, delusions, and are acting out by making suicidal gestures, yelling and screaming, and smearing feces.  Instead of reducing the risk of harm by removing them from solitary confinement, correctional officers, in accordance with Defendant's policies and procedures, place them in restraint chairs and/or increase the amount of time they are locked in their cells.

54.    Individuals, including Plaintiffs Chavez and Bracamonte, who have managed to avoid complete mental decompensation have done so thus far by developing harmful responses that deaden feelings and emotions, and suppress anger.  They attempt to

14

suppress that rage in order to avoid self-destruction, irresponsible acts of violence, or a mental breakdown.  Plaintiffs' attempts at suppression, in combination with their isolation, have led them to increasingly withdraw into themselves and become emotionally numb to the point of feeling "non-human."

55.    Defendant is aware of the risk of harm caused by its actions.  On June 25, 2015, the Prison Law Office sent a letter describing the risk of harm to individuals from Defendant's policies and practices related to solitary confinement, and requested a meeting.  The Sheriff and other jail managers met with the Prison Law Office, but did not agree to significantly ameliorate the harmful conditions in solitary confinement.  The Prison Law Office sent another letter to Defendant on August 5, 2015, again describing the risk of harm.

56.    Numerous individuals, including Plaintiffs Chavez and Bracamonte, have also repeatedly requested, through internal jail request forms and grievances, to be removed from solitary confinement because of harm caused by the inhumane conditions. Defendant has not moved any people out of solitary confinement in response to these requests.   Community organizations, including family members, have met with and contacted Sheriff's Department staff and members of the Board of Supervisors repeatedly about conditions in solitary confinement.   Defendant has not ameliorated the harsh conditions in response to their concerns.

II.    **People are Locked in Solitary Confinement Even Though They Pose No Threat to Safety or Security and Have No Meaningful Opportunity to Challenge Their Placement.**

57.    Defendant locks people in solitary confinement for indefinite terms based on a classification system that its own consultants have called "questionable" because it lacks validity, reliability, and integrity.  Defendant does not make decisions about where individuals should be housed using standardized classification policies and procedures. Valid and reliable classification policies and procedures are based on quantitative and objective factors, focused on people's behaviors, that identify their custody and security requirements.  Defendant does not use such classification policies and procedures.

**58.** In July 2014, Defendant hired a correctional consulting firm, MGT of America, Inc. (MGT), to evaluate jail conditions and systems. In December 2014, MGT produced a report that, among other things, excoriated Defendant's jail classification system. It found the system to be exceptionally complicated and highly subjective and concluded that jail staff is not appropriately trained on the system. MGT warned that the system "creates a potential risk of costly mistakes." MGT also found that Defendant does not consider individuals' actual institutional behaviors when classifying them. For example, nearly 20% of people identified as maximum security are classified that way due only to their criminal charges and not their behaviors in the jail, which MGT found to be unacceptable.

**59.** Defendant maintains this system even though there is no penological basis for doing so. Defendant locks people in solitary confinement who pose no legitimate security threat to staff or other prisoners. For example, Mr. Chavez has been in custody since 2011, but has never been violent or charged with any serious rule violations in the jail. Defendant has housed him in various locations with varying levels of restrictions throughout the jail without incident. Indeed, for two years, jail officials gave him special privileges as a jail trustee because of his good behavior. Then, in November 2014, Defendant moved him to solitary confinement in Third West Max and stripped him of his trustee assignment even though he continued to remain discipline free.

**60.** Other jurisdictions, including the California Department of Corrections and Rehabilitation (CDCR), have ended the practice of housing prisoners in solitary confinement just because they are suspected gang members. CDCR prisoners housed in the most restrictive settings have significantly more out-of-cell time than people in Defendant's solitary confinement cells.

**61.** Defendant also has a policy and practice of locking people in solitary confinement who have only been charged with minor rules violations that do not justify such restrictive housing. For example, the County locked a woman in solitary confinement for two and a half years even though her most serious offenses were talking back to

16

correctional officers or yelling and banging on her cell door with other individuals in the unit.

62.     Defendant also has a policy and practice of locking people in solitary confinement without notice, explanation, written reasons for the decision, or an opportunity to present witnesses or documentary evidence to challenge the decision.  For example, correctional officers told Mr. Bracamonte that he was housed in Third West Max because of his participation in an alleged "gang assault" over two years ago, where his only involvement was being present in the dayroom when the purported assault took place. Defendant has not presented Mr. Bracamonte with any evidence that he assaulted, or planned to assault, another person, and has denied him any opportunity to challenge his placement.

63.     There is no meaningful avenue to contest an incorrect placement decision. Several people, including Plaintiffs, have attempted to challenge classification decisions through the grievance system, and the County's only response is that they have been "properly housed" and they will not be moved.  The County has told others that their classification status will be reviewed every 30 days, but individuals cannot participate in this review process and the reviews rarely, if ever, result in changes to classification status for those in solitary confinement.  Such reviews are therefore meaningless.

64.     Defendant's policy and practice retains people in solitary confinement arbitrarily despite their good behavior, in reliance on opaque classification decisions, and without reasonable penological justification.

III.    Santa Clara County Seriously Injures People Through the Excessive Use of Force.

65.     Defendant has a policy and practice of using excessive force in the jails that subjects people to serious injury or the risk of serious injury.  Correctional officers repeatedly kick, punch, push, stomp, slam, or restrain individuals when it is not necessary to ensure safety and security.  These assaults result in broken bones, head injuries, hemorrhaging, swelling, bruising, and even death.  Individuals in the jail are routinely sent

17

to the emergency room after groups of correctional officers have beaten them in response to minor provocations.

66.     Defendant has a pattern of using force as a first resort in reaction to any behavior that might possibly be interpreted as aggressive.  Force is used on people who are deemed, correctly or not, to have disrupted jail operations, disobeyed jail rules, complained about conditions, or disrespected jail staff.  In many instances, the use of force is completely unnecessary to control behavior or maintain order in the jails.  In some instances, the use of force may be necessary *initially*, but after the need for force has passed, the individual is subjected to retaliatory assault.

67.     These patterns of excessive force occur because Defendant does not adequately train, supervise, and discipline correctional officers.  Defendant also fails to investigate complaints regarding the use of force.  Since 2010, people in the jail have filed more than 300 complaints against correctional officers.  Defendant only formally investigated 14 of those complaints.

68.     These patterns of excessive force also occur because Defendant's written policies and procedures are inadequate.  All people in the jail, including Plaintiffs Chavez and Bracamonte, are at risk of harm due to Defendant's policies and practices regarding the use of force.

## IV.     Santa Clara County Fails to Provide Adequate Health Care.

69.     Defendant subjects all people confined in the jails, including Plaintiffs Chavez and Bracamonte, to a substantial risk of injury or death by failing to provide adequate medical, mental health, and dental care.  Individuals in the jails are entirely dependent on Defendant for their basic healthcare needs.  Defendant has a policy and practice of inadequately screening for serious healthcare conditions and disabilities, delaying access to clinicians and medications, understaffing healthcare professionals, denying specialty care, and failing to provide the full array of services necessary to meet minimum standards of care.  Defendant is deliberately indifferent to the risk of harm caused by these serious healthcare deficiencies.

1    **A. Mental Health Care Is Inadequate.**

2    **70.**    Defendant's mental health care delivery system is deficient in staffing,

3    screening, therapeutic treatment, suicide prevention, crisis intervention, medication

4    management, and timely evaluations.  There are not enough psychiatrists and therapists to

5    meet the demands of the current jail population.  The intake screening does not include

6    essential questions about mental status, recent psychiatric hospitalizations, community

7    treatment providers, or intellectual disabilities.  People who are experiencing severe mental

8    health symptoms are chained to chairs for hours in the booking area.  "Treatment" consists

9    primarily of medication management, which is poorly administered, and Defendant does

10   not provide individual or group counseling to help people cope with their mental health

11   symptoms.  Individuals who are prescribed psychiatric medications in the community often

12   wait weeks or months, while suffering from severe symptoms, before receiving

13   medications in jail.

14   **71.**    Defendant does not properly identify, evaluate, house, monitor, or treat

15   people who are suicidal, resulting in preventable deaths and injuries.  Ten people have

16   committed suicide while incarcerated in Santa Clara County in the last five years.  From

17   2007 to 2012, Santa Clara County had the third highest suicide rate amongst the state's

18   largest jail systems, more than doubling the suicide rates in Los Angeles, Orange,

19   Alameda, and Fresno Counties.  Some of these individuals committed suicide in solitary

20   confinement, where mental health staff do not monitor people or provide enhanced mental

21   health services despite the well-known risks inherent in locking people alone in their cells

22   for prolonged periods of time.

23   **72.**    Defendant fails to hospitalize the most acutely mentally ill people.  Instead,

24   Defendant sends them to Unit 8A in the North Jail where they are housed in solitary

25   confinement.  Unit 8A is not a licensed hospital and there is nothing therapeutic about the

26   environment; it is indistinguishable from other jail units.  Psychiatrists meet with patients

27   briefly and infrequently through cell doors, or in the dayroom, without any confidentiality.

28   There are no rehabilitation programs, activities, or therapy.  Defendant inappropriately

secludes, restrains, and involuntarily medicates people in Unit 8A when there is no imminent danger, and without following proper procedures, in violation of their due process rights.  Defendant also fails to involuntarily medicate people when the reasonable standard of care would require, such as when they are gravely disabled and incompetent to refuse medications.  Defendant's treatment plans are ineffective, and people with severe mental illness perpetually cycle in and out of this unit.

73.     Defendant does not appropriately respond to people in mental health crisis. Indeed, Defendant's initial response is often the use of force.  For example, in September 2015, Walter Roches, who had a history of refusing psychiatric medications to treat his serious mental illness, began to severely decompensate.  He became catatonic and stopped showering.  Due to his acute mental health symptoms, he sat passively on his bed, unable to comply with correctional officers' orders to leave his cell.  Correctional officers' first response was to shoot a series of chemical agents and plastic bullets at his torso through the food port of his cell door.  After Defendant forcibly removed him from his cell, Mr. Roches refused all medical and mental health care, although he was likely incompetent to make treatment decisions.  Defendant failed to involuntarily medicate or treat him.  He died a week later.  Defendant conducted the autopsy, and found bruises and abrasions all over Mr. Roches' body, as well as significant head trauma that is not explained by the video or reports from the use of force incident.  Defendant's autopsy also concluded that his death was caused by a urinary tract infection and mental illness, and was unrelated to his head trauma or other use of force injuries.

74.     Defendant does not have a functioning system to ensure timely access to mental health care.  Individuals must submit "white cards" to request care, but clinicians do not respond for weeks or months, if they respond at all.  For example, Mr. Bracamonte submitted a white card on May 16, 2015, stating "I have not had fresh air or sunlight in 6 months and it is effecting [sic] my anxiety level I'm stressed out always anxious and jumpy. . . ."  Defendant did not respond until seven months later, and then only in writing to tell him he would be later scheduled to see a psychiatrist.  To date, Mr. Bracamonte has

20

1  not been seen by a psychiatrist or received adequate mental health care to treat the

2  symptoms related to being locked in solitary confinement.

3  **B. Medical Care is Inadequate.**

4  **75.**    Defendant's medical care delivery system is dangerously deficient.  At least

5  40 people have died in the jails since 2010.  Some were men and women under the age of

6  50 who died of treatable medical conditions such as sleep apnea or alcohol withdrawal.

7  Others died of chronic conditions such as diabetes and high blood pressure, which is

8  emblematic of an inadequate chronic disease management program.  Medical care is also

9  deficient in many of the same ways as mental health care: insufficient staffing levels,

10  unreasonable delays in responding to white cards describing serious symptoms, and

11  excessive delays in verifying and starting essential medications prescribed by community

12  providers.   In addition to preventable deaths, these deficiencies result in needless

13  emergency room visits and hospitalizations.

14  **76.**    Defendant fails to provide timely access to specialty care.  For example,

15  Defendant does not provide optometry services or prescription eyeglasses.   There are

16  countless people in the jail who are suffering from vision problems, including pretrial

17  detainees who cannot meaningfully participate in their defense, because Defendant denies

18  them optometry services.

19  **C. Dental Care is Inadequate.**

20  **77.**    Defendant does not provide the full range of dental services that is necessary

21  to maintain dental health.  It does not, for example, provide permanent fillings, teeth

22  cleanings, or dental floss, even for those people who will be incarcerated for several years.

23  Instead, Defendant offers to extract teeth that might otherwise be saved with appropriate

24  treatment alternatives.  Defendant has a policy and practice of performing only the first

25  stage of a root canal and instructing individuals to finish the procedure upon release, even

26  if the release date is unknown, as with pretrial detainees.  This practice leaves people who

27  are incarcerated for long periods of time at risk of infection, pain, and further

28  complications.  Defendant also fails to timely respond to white cards describing serious

21

dental symptoms.

**V.     Santa Clara County Discriminates Against People with Disabilities in the Use of Force and Solitary Confinement.**

**78.**     Defendant violates the rights of people with psychiatric and/or intellectual disabilities by housing them in solitary confinement; by failing to accommodate their particular vulnerability to the conditions of solitary confinement; by denying them access to programs and services because they are housed in solitary confinement based on behaviors related to their disabilities; and by using force to control behaviors associated with untreated mental illness or lower cognitive functioning.

**79.**     Defendant automatically houses people with disabilities who need the highest level of mental health care in units where they are locked down at least 22 to 24 hours a day for prolonged periods, regardless of whether their crimes or behavior warrant solitary confinement, solely due to their mental illness or intellectual disability.

**80.**     As described in Section I.C. above, the stressful conditions of solitary confinement are more traumatic for people with psychiatric and/or intellectual disabilities. Defendant has not modified its policies and procedures to accommodate them so that they do not suffer harm from solitary confinement.

**81.**     Defendant locks people with psychiatric and/or intellectual disabilities in solitary confinement for nonconforming and erratic behaviors related to their conditions, some of which could have been avoided if Defendant provided adequate mental health care or accommodations.   The harsh conditions and the lack of mental health care or accommodations cause them to continue and escalate these symptomatic behaviors.   In response, Defendant locks them in solitary confinement for longer periods of time.

**82.**     Defendant's policy and practice of locking people with psychiatric and/or intellectual disabilities in solitary confinement, based on their disabilities, inappropriately deprives them of access to programs, services, and activities that are only available in less restrictive settings.

**83.**     Defendant has a policy and practice of responding to behaviors related to

psychiatric and/or intellectual disabilities with force. Defendant uses such force without regard to the traumatic impact of such measures, and without first attempting clinical intervention.

**84.** Defendant's policies and procedures regarding the use of solitary confinement and force against people with psychiatric and/or intellectual disabilities is a direct violation of the ADA and Section 504 of the Rehabilitation Act.

## VI.   Class Allegations

**85.** Plaintiffs Brian Chavez and Brandon Bracamonte bring this action on their own behalves and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all people who are or will in the future be incarcerated in the Santa Clara Jail.

**86.** All class members are at risk of harm due to the following policies and practices:

(a) Denying at least one basic human need, including physical exercise, fresh air, sunlight, normal human contact, meaningful activity, and environmental stimulation, by locking people in solitary confinement;

(b) Locking people in solitary confinement for no legitimate security purpose, and/or without (1) a hearing with advance written notice (except in case of a genuine emergency) before initial placement, and/or (2) the opportunity to present witnesses and documentary evidence, and/or (3) written reasons for the decision, and/or (4) counsel-substitute for an illiterate or disabled inmate or in a case with complex issues, and/or (5) meaningful review of their placements;

(c) Using force that subjects people to serious injury or the risk of serious injury even when it is unnecessary to control behavior or maintain order in the jails; and

(d) Denying minimally adequate healthcare including identification and monitoring of serious conditions, sufficient staffing levels, timely access to appropriate clinicians and medications, effective suicide prevention practices, appropriate crisis intervention services, and the complete range of healthcare services necessary to maintain

health.

People with psychiatric and/or intellectual disabilities also face the additional risk of disability discrimination due to Defendant's policies and practices regarding solitary confinement and the use of force.

**87.** There are questions of law and fact common to the class including whether Defendant by its policy and practice of (1) denying individuals' basic human needs by locking them in their cells for 22 to 24 hours a day for periods of three weeks or longer violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (2) locking people in solitary confinement for minor rules violations or because they are suspected gang members violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (3) locking people in solitary confinement without a hearing, written notice, an opportunity to defend themselves through witness or documentary evidence, or meaningful review of their placements, violates the Due Process Clause of the Fourteenth Amendment; (4) denying minimally adequate mental health, medical, and dental care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (5) using excessive force violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (6) locking people with psychiatric disabilities and/or intellectual disabilities in solitary confinement based on their disabilities violates the ADA and Section 504 of the Rehabilitation Act; and (7) using force on people with psychiatric and/or intellectual disabilities without clinical intervention or regard for the traumatic impact of such force violates the ADA and Section 504 of the Rehabilitation Act.

**88.** Since there are thousands of class members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for Defendant.

**89.** Defendant has acted and failed to act on grounds that apply generally to the

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

**90.** Plaintiffs' claims are typical of the claims of the class, since their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theories of law as the class's claims.

**91.** The named Plaintiffs, through counsel, will fairly and adequately protect the interests of the class. Plaintiffs do not have any interests antagonistic to the plaintiff class. Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendant. Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## CLAIMS FOR RELIEF

### First Cause of Action
### (Fourteenth Amendment - Cruel and Unusual Conditions, 42 U.S.C. § 1983)

**92.** Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

**93.** By the policies and practices described herein, Defendant has deprived and continues to deprive Plaintiffs and the class of the minimal civilized measure of life's necessities, and has violated their basic human dignity and their right to be free from cruel and unusual conditions under the Fourteenth Amendment to the United States Constitution for each of the reasons set forth below.

**A. Solitary Confinement**

**94.** The effect of prolonged confinement constitutes a serious deprivation of at least one basic human need, including, but not limited to, normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, fresh air, sunlight, and meaningful activity.

**95.** Prolonged exposure to these deprivations of basic human needs is currently imposing permanent psychological and physical injury on Plaintiffs and the class they represent. In addition to Plaintiffs' current psychological and physical pain, the likelihood

1   that Plaintiffs and the class will remain in solitary confinement for the foreseeable future

2   subjects Plaintiffs and the class they represent to a significant risk of debilitating and

3   permanent mental illness and physical harm.

4        **96.**    Defendant's continuation of class members' solitary confinement for many

5   months or years under the debilitating and extreme conditions strips human beings of their

6   basic dignity and humanity in violation of contemporary standards of human decency and

7   constitutes cruel and unusual conditions prohibited by the Fourteenth Amendment to the

8   United States Constitution.

9        **97.**    Defendant has no legitimate penological interest in retaining Plaintiffs and

10   the class indefinitely in the debilitating conditions of solitary confinement simply because

11   of their charges, alleged gang status, or minor rules violations.  Accordingly, Defendant's

12   policy of indefinite and prolonged solitary confinement constitutes unlawful punishment of

13   individuals who have not been convicted.

14       **B**.  **Inadequate Healthcare**

15        **98.**    Defendant is deliberately indifferent to the serious health care needs of

16   Plaintiffs and the class.  Defendant subjects Plaintiffs and the class to a substantial risk of

17   serious harm and injury from inadequate medical, mental health, and dental care.

18       **C. Excessive Use of Force**

19        **99.**    Defendant uses excessive force, often when unnecessary to maintain and

20   restore discipline, causing serious injuries to class members.  Defendant subjects Plaintiffs

21   and the class to a substantial risk of serious harm and injury from the use of excessive and

22   unnecessary force.

23       **D.  Defendant's Deliberate Indifference**

24        **100.**    The policies and practices complained of herein have been and continue to

25   be implemented by Defendant and its agents, officials, employees, and all persons acting in

26   concert under color of state law, in their official capacity.

27        **101.**    Defendant has been and is aware of all of the deprivations complained of

28   herein, and has condoned or been deliberately indifferent to such conduct.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

102.   It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.  Moreover, Defendant has repeatedly been made aware, through administrative grievances and written complaints, that class members are currently experiencing, or are at risk of, significant and lasting injury.  Defendant has been deliberately indifferent to the class members' pain and suffering.

**Second Cause of Action**
**(Eighth Amendment – Cruel and Unusual Punishment, 42 U.S.C. § 1983)**

103.   Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

104.   By the policies and practices described herein, Defendant subjects Plaintiffs and the class to a substantial risk of serious harm and injury from the use of solitary confinement, inadequate healthcare, and excessive force, and has violated their right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.  These policies and practices have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and the class's ongoing deprivation of rights secured under the Eighth Amendment.

105.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

**Third Cause of Action**
**(Fourteenth Amendment – Procedural Due Process, 42 U.S.C. § 1983)**

106.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-91 as if set forth fully herein.

107.   Defendant's policy of indefinite and prolonged solitary confinement subjects Plaintiffs and the class to a significant deprivation of liberty without any procedural safeguards.

108.   Plaintiffs and the class have a liberty interest, conferred by statewide

27

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

regulations, in not being confined in solitary confinement unless it is necessary to ensure the safety and security of staff and other individuals. *See* CAL. CODE REGS. tit. 15, §§ 1050, 1053.

109. The conditions and the duration of Defendant's placement of Plaintiffs and class members in solitary confinement constitute an atypical and significant hardship as compared with the ordinary incidents of jail life because of the harsh and isolated conditions and the lengthy duration of confinement in those conditions. People in solitary confinement, as compared to other individuals in the jail, have significantly less or no access to social interaction, environmental stimulation, programs and activities, physical exercise, personal property, sunlight, and fresh air. They are also subjected to, as compared to other individuals in the jail, significantly more oppressive security measures, including cell searches, strip searches, and restraints.

110. Because prolonged placement in solitary confinement constitutes a significant and atypical hardship, by the policies and practices described herein, Defendant has deprived Plaintiffs and class members of a liberty interest without due process of law by denying them (1) a hearing with advance written notice before initial placement in solitary confinement, (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision, (4) counsel-substitute for illiterate or disabled individuals or in a case with complex issues, and (5) meaningful and timely periodic review of their continued long-term and indefinite detention in solitary confinement and meaningful notice of what they must do to earn release, in violation of the Fourteenth Amendment to the United States Constitution.

111. The costs to Defendant of providing such procedural safeguards would be minimal, and any such costs are outweighed by the great risk of erroneous deprivation of liberty that exists under Defendant's current policies and practices.

112. The policies and practices complained of herein have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity.

1

**Fourth Cause of Action
(Americans with Disabilities Act)**

2

3      **113.**    Plaintiffs incorporate by reference each and every allegation contained in

4    Paragraphs 1-91 as if set forth fully herein.

5      **114.**    Plaintiff Bracamonte and other class members with psychiatric and/or

6    intellectual disabilities are qualified individuals with disabilities as defined in the ADA.

7    They have a mental impairment that substantially limits one or more major life activities,

8    they have a record of such impairment, or they are regarded as having such an impairment.

9    All people with psychiatric and/or intellectual disabilities in the jails meet the essential

10   eligibility requirements for the receipt of services or the participation in programs or

11   activities provided by Defendant.  42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

12     **115.**    Defendant is a public entity as defined under 42 U.S.C. § 12131(1)(A).

13     **116.**    Defendant violates the ADA by failing to ensure that people with psychiatric

14   and/or intellectual disabilities have access to, are permitted to participate in, and are not

15   denied the benefits of, programs, services, and activities.  42 U.S.C. § 12132; 28 C.F.R. §

16   35.152(b)(1).

17     **117.**    Defendant violates the ADA by failing to make "reasonable modifications in

18   policies, practices, or procedures when the modifications are necessary to avoid

19   discrimination on the basis of disability . . . ."  28 C.F.R. Section 35.130(b)(7).

20     **118.**    Defendant violates the ADA by failing to "ensure that inmates or detainees

21   with disabilities are housed in the most integrated setting appropriate to the needs of the

22   individuals."  28 C.F.R. § 35.152(b)(2).

23     **119.**    Plaintiff Bracamonte and other class members with psychiatric and/or

24   intellectual disabilities do not pose a direct threat to others and housing them in solitary

25   confinement is not a legitimate safety requirement necessary for the safe operation of

26   services, programs, or activities.  35 C.F.R. § 35.139.

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**Fifth Cause of Action**
**(Section 504 of the Rehabilitation Act)**

**120.**   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-91 as if set forth fully herein.

**121.**   Plaintiff Bracamonte and other class members with psychiatric and/or intellectual disabilities are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**122.**   Defendant receives federal funding within the meaning of the Rehabilitation Act.

**123.**   Defendant violates Section 504 of the Rehabilitation Act by discriminating against people with psychiatric and/or intellectual disabilities solely on the basis of their disabilities.  29 U.S.C. § 794.

**124.**   Defendant violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate people with psychiatric and/or intellectual disabilities in its facilities, programs, activities, and services.

**125.**   Defendant's policy and practice of discriminating against people with psychiatric and/or intellectual disabilities in the use of solitary confinement is not reasonably related to legitimate penological interests because (1) it worsens their psychiatric conditions; (2) there are no alternative means for them to access programs, services, and activities; (3) there are alternative means to safely and cost-effectively house them in the jails; and (4) it is an exaggerated response as they do not require restrictive housing on the basis of their disabilities.

**PRAYER FOR RELIEF**

**126.**   Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendant as alleged herein, unless Plaintiffs are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1  the Constitution of the United States, the ADA, and Section 504 of the Rehabilitation Act.

2  **127.** WHEREFORE, Plaintiffs on behalf of themselves and the class they

3  represent, request that this Court grant them the following relief:

4  A. Declare the suit is maintainable as a class action pursuant to Federal Rule of

5  Civil procedure 23(a) and 23(b)(1) and (2);

6  B. Adjudge and declare that the conditions, acts, omissions, policies, and practices

7  of Defendant and its agents, officials, and employees are in violation of the rights of

8  Plaintiffs and the class they represent under the Fourteenth and Eighth Amendments to the

9  U.S. Constitution, the ADA, and Section 504 of the Rehabilitation Act;

10  C. Enjoin Defendant, its agents, officials, employees, and all persons acting in

11  concert under color of state law or otherwise, from continuing the unlawful acts,

12  conditions, and practices described in this Complaint;

13  D. Order Defendant, its agents, officials, employees, and all persons acting in

14  concert with them under color of state law or otherwise, to develop and implement, as soon

15  as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and

16  members of the class suffer due to Defendant's policy and practice of locking people in

17  their cells for 22 hours or more a day for three weeks or longer, to ensure that people are

18  not housed in restrictive housing without a legitimate penological purpose, and to provide

19  a meaningful opportunity to be heard and to challenge classification decisions resulting in

20  solitary confinement.  Defendant's plan must include at a minimum the following:

21  1.  Elimination of the conditions of confinement for people in solitary

22  confinement so that individuals are no longer incarcerated under conditions of isolation,

23  sensory deprivation, lack of social and physical human contact, unsanitary conditions, and

24  environmental deprivation;

25  2. The release from restricted housing for those individuals who do not pose a

26  legitimate security threat;

27  3. Standardized classification policies and procedures based on objective and

28  quantitative factors that focus on individuals' in-jail behavior;

31

4. Provision of (1) a hearing with advance written notice before initial placement in solitary confinement, (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision, (4) counsel-substitute for an illiterate or disabled person or in a case with complex issues, and (5) meaningful and timely periodic review of their continued long-term and indefinite detention in solitary confinement;

E. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide minimally adequate mental health, medical, and dental care, including but not limited to sufficient staffing, timely access to appropriate clinicians, timely prescription and distribution of appropriate medications and supplies, timely and competent responses to health care emergencies; timely access to competent care for chronic diseases; timely access to competent therapy, inpatient treatment, and suicide prevention;

F. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the excessive use of force.  Defendant's plan at a minimum must address deficiencies in use of force policies and procedures, training, supervision, investigations, and disciplinary practices;

G. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide equal access to programs, services, and activities for people with psychiatric and/or intellectual disabilities, including but not limited to housing them in the least restrictive and most integrated settings appropriate to their needs;

H. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to modify its use of force policies and practices to ensure appropriate clinical intervention and measures to minimize the traumatic impact of the use of force on people with psychiatric and/or intellectual disabilities;

I. Award Plaintiffs, pursuant to 29 U.S.C. § 794, 42 U.S.C. §§ 1988, 12205, and

1  12133, the costs of this suit and reasonable attorneys' fees and litigation expenses;

2      J. Retain jurisdiction of this case until Defendant has fully complied with the orders

3  of this Court, and there is a reasonable assurance that Defendant will continue to comply in

4  the future absent continuing jurisdiction; and

5      K. Award such other and further relief as the Court deems just and proper.

6  Dated:  January 20, 2016                    PRISON LAW OFFICE

7

8                                             By: /s/ Kelly Knapp
                                              DONALD SPECTER
9                                             KELLY KNAPP
                                              1917 Fifth Street
10                                            Berkeley, California 94710
                                              Telephone: (510) 280-2621
11                                            Fax: (510) 280-2704

12                                            COOLEY LLP

13

14                                            By: /s/ Jessica Valenzuela Santamaria
                                              JESSICA VALENZUELA SANTAMARIA
15                                            JEFFREY W. WALKER
                                              ADDISON M. LITTON
16                                            3175 Hanover Street
                                              Palo Alto, CA 94304
17                                            Telephone: (650) 843-5000

18                                            By: /s/ Kendall Dawson Wasley
19                                            KENDALL DAWSON WASLEY
                                              PMB 233
20                                            1520 E. Covell Blvd.
                                              Davis, CA 95615
21                                            Telephone: (408) 827-5024

22

23                                            *Attorneys for Plaintiffs*

24

25

26

27

28