DONALD SPECTER
dspecter@prisonlaw.com
MACKENZIE L. HALTER
mhalter@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621

KYUNG TAECK MINN
rminn@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**EUREKA DIVISION**

BRIAN CHAVEZ and BRANDON BRACAMONTE, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

v.

COUNTY OF SANTA CLARA,

*Defendant.*

Case No. 1:15-cv-05277-RMI

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CONTEMPT**

**Date: January 13, 2025**
**Time: 11:00 a.m.**

**Magistrate Judge Robert M. Illman**

## TABLE OF CONTENTS


Page

FACTUAL BACKGROUND ....... 1

A. Litigation And Consent Decree ....... 1

B. Chronic Understaffing Leads To Persistent Non-Compliance With The Consent Decree. ....... 3

i. Mental Health Care ....... 3

ii. Medical Care ....... 7

C. Repeated Attempts To Move The County Towards Compliance With The Consent Decree. ....... 9

ARGUMENT ....... 14

I. Defendants Are In Civil Contempt Because They Knowingly Continue To Violate The Court-Ordered Consent Decree and Remedial Plan. ....... 15

A. The Court Issued A "Specific And Definite" Order. ....... 15

B. Clear And Convincing Evidence Demonstrates That Defendant Is In Violation Of The Court's Order. ....... 18

C. Defendants Have Not Taken All Reasonable Steps To Comply With The Consent Decree and Remedial Plan. ....... 19

D. This Court Should Order Civil Contempt Sanctions That Will Coerce The County Into Compliance With The Remedial Plan. ....... 21

CONCLUSION ....... 233

# TABLE OF AUTHORITIES

**Cases**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
228 F.3d 574 (5th Cir. 2000) ....................16

*Brown v. Plata*,
563 U.S. 493 (2011) ....................14

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) .................... *passim*

*Dep't of Fair Emp. & Hous. v. L. Sch. Admission Council Inc.*,
2018 WL 1156605 (N.D. Cal. Mar. 5, 2018) ....................16

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
10 F.3d 693 (9th Cir. 1993) ....................14, 19

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
702 F.2d 770 (9th Cir. 1983) ....................22

*Gates v. Shinn*,
98 F.3d 463 (9th Cir. 1996) ....................17

*Gray v. County of Riverside*,
5:13-CV-00444 (C.D. Cal) ....................3

*Hutto v. Finney*,
437 U.S. 678 (1978) ....................14

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014) ....................14

*Jeff D. v. Kempthorne*,
2007 WL 461471 (D. Idaho Feb. 7, 2007) ....................16, 17, 18

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ....................22

*Lab./Cmty. Strategy. Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*,
564 F.3d 1115 (9th Cir. 2009) ....................14

*Lancaster v. Tilton*,
2007 WL 1807825 (N.D. Cal. June 21, 2007) ....................16, 18

*N. Alamo Water Supply Corp. v. City of San Juan, Tex.*,
90 F.3d 910 (5th Cir. 1996), *overruled on other grounds*, *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) ....................16

*Nehmer v. U.S. Dep't of Veterans Affs.*,
494 F.3d 846 (9th Cir. 2007) ....................16

*Nunez v. New York City Dep't of Corr.*,
758 F. Supp. 3d 190 (S.D.N.Y. 2024)....................16, 18

*Plata v. Newsom*,
No. 3:01-CV-01351 (N.D. Cal) ....................7

*Reno Air Racing Ass'n v. McCord*,
452 F.3d 1126 (9th Cir. 2006) ....................14

*Rouser v. White*,
825 F.3d 1076 (9th Cir. 2016) ....................21

*SEC v. Hickey*,
322 F.3d 1123 (9th Cir. 2003), *amended on denial of reh'g*, 335 F.3d 834 (9th Cir. 2003) ....................21

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992) ....................14

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947)....................22

**Statutes**

Americans with Disabilities Act ....................1

Rehabilitation Act Section 504 ....................1

**Other Authorities**

Eighth Amendment....................15

Fourteenth Amendment ....................15

TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on Tuesday January 13, at 11:00 a.m., or as soon thereafter as counsel may be heard by the above entitled Court, located at 3140 Boeing Avenue in McKinleyville, California in the courtroom of the Honorable Robert Illman, Plaintiffs will and hereby do move the Court for an Order holding Defendant County of Santa Clara in civil contempt.

The court-ordered Consent Decree and Remedial Plan in this case require Defendant to employ enough staff to ensure that people incarcerated in the Santa Clara County Jails receive constitutionally adequate medical and mental health care. Because Defendant has for years failed to employ the number of custody staff necessary to achieve this aim, Plaintiffs ask the Court to hold Defendant in civil contempt of court. Finally, Plaintiffs ask the Court to impose monthly monetary sanctions until the County achieves substantial compliance with the court-ordered Remedial Plan's provision requiring adequate custody staffing.

## FACTUAL BACKGROUND

### A. Litigation And Consent Decree

Plaintiffs are a group of people who are or have been detained in Santa Clara County Jails (Jails).[1] They brought this class action against Defendant Santa Clara County (County) in 2015 to challenge conditions of their confinement. *See* Class Action Compl. for Inj. and Declaratory Relief, Dkt. No. 1; First Am. Class Action Compl. for Inj. and Declaratory Relief, Dkt. No. 9. Specifically, and as relevant here, Plaintiffs alleged that the County failed to provide them with access to adequate medical, dental, or mental health services.[2] Am. Compl. ¶¶ 6–7, 69–77, Dkt. No. 9.

---

[1] The Jails consist of two facilities: the Main Jail Complex (Main Jail) and the Elmwood Complex Men's Facility (Elmwood). Plaintiffs' complaint and the resulting Court-ordered Consent Decree and Remedial Plan cover both facilities.

[2] Plaintiffs also alleged that Defendant failed to prevent unnecessary and excessive use of force against inmates; imposed on inmates harmful and excessive use of solitary confinement; and discriminated against inmates with non-mobility disabilities in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Am. Compl. ¶¶ 1–7, 21–68, 78–84.

On a joint motion, this Court certified a class consisting of "[a]ll people who are now, or in the future will be, incarcerated in the Santa Clara County jails" and a subclass of "[a]ll people who are now, or in the future will be, incarcerated in the Santa Clara County jails and who have a psychiatric and/or intellectual disability, as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794." Order Certifying Action as Class Action 2, Dkt. No. 34.

Plaintiffs and Defendant agreed to suspend discovery while investigating the allegations and engaging in settlement negotiations. Joint Case Mgmt. Statement 2–3, Dkt. No. 14. The parties further agreed that the experts Defendant had hired before Plaintiffs filed this lawsuit were appropriate to investigate and opine on the adequacy of the medical and mental health care delivered in the County's Jails. *Id.*

In late 2018, after years of extensive investigation and protracted settlement negotiations, the parties jointly entered into a Consent Decree incorporating a detailed, 46-page Remedial Plan. *See* Notice of Mot. and Mot. for Prelim. Approval of Consent Decree and Notice to the Class, Dkt. No. 73; Decl. of Donald Specter in Supp. of Joint Mot. for Prelim. Approval of Consent Decree, Dkt. No. 74. In March 2019, this Court approved the Consent Decree and Remedial Plan. Order Granting Final Approval of Class Action Settlement, Dkt. No. 106; *see also* Consent Decree, Dkt. No. 109 and Remedial Plan, Dkt. No. 109-1.

Among other things, the Consent Decree and Remedial Plan require the County to provide constitutionally sufficient medical and mental health care. Consent Decree ¶¶ 1, 10; Remedial Plan at 5–21. To that end, the court-ordered Remedial Plan directs the County to "provide sufficient . . . custodial staff . . . to comply with" its terms. Remedial Plan at 6. Under the terms of the Court-ordered Consent Decree and Remedial Plan, the parties' agreed to select joint neutral experts to monitor compliance with the Remedial Plan and assist in dispute resolution. Consent Decree ¶ 13. The experts complete comprehensive reviews of Defendant's progress every 180 days and have

reasonable access to all parts of the Jails. Consent Decree ¶¶ 13, 16. In the event of a dispute, the parties agreed in the Consent Decree to an informal dispute resolution process, including involvement of the experts and a mediator as appropriate. Consent Decree ¶ 28. Finally, the parties agreed that this Court would retain "jurisdiction to enforce the terms of [the] Consent Decree," with the "power to enforce the agreement through specific performance and all other remedies permitted by law until Defendant fulfills its obligations under [the] Consent Decree." Consent Decree ¶ 29.

### B. Chronic Understaffing Leads To Persistent Non-Compliance With The Consent Decree.

Although half a decade has passed since this Court approved the parties' Consent Decree and Remedial Plan, the medical and mental health care the County provides people incarcerated in its Jails remains woeful. There is no dispute that the County is not compliant with the staffing provisions. The jointly selected neutral medical and mental monitors and the County agree that there hasn't been compliance for years. As the monitors have repeatedly highlighted, there are simply too few staff—and too many incarcerated people—for the County to provide those confined in its Jails with constitutionally adequate mental health and medical care.

#### i. Mental Health Care[3]

Since at least "2022, the Mental Health Monitors have consistently identified the same persistent systemic barriers preventing the County from achieving substantial compliance" with—or even "durable progress" toward—the Remedial Plan's

---

[3] Dr. Brian Main, a psychologist with experience and expertise on mental health care in detention settings, has served as the Mental Health Monitor since November of 2022. Dr. Main has over 15 years of correctional psychology experience, including as Chief of Mental Health at North Kern State Prison and as Chief Psychologist at Richard J. Donovan Correctional Facility. He's also worked extensively as a correctional mental health expert and court monitor, including as a court mental health expert and monitor in *Coleman v. Newsom*, No. 2:90-CV-00520 (N.D. Cal) and *Gray v. County of Riverside*, 5:13-CV-00444 (C.D. Cal). He's also served as a mental health expert for Miami Dade County Corrections and Rehabilitation Department and Forensic Health Services in Massachusetts. *See* Specter Decl., Ex. 1 (Dr. Main Curriculum Vitae).

provisions: "the large size of the incarcerated population," and "insufficient . . . custody staffing." Decl. of Donald Specter in Support of Pl.'s Mot. for Contempt [hereinafter Specter Decl.], Ex. 2 at 1 (DRAFT Tenth Mental Health (MH) Monitoring Report, 2025).

A large percentage of the County's Jail population requires mental health services, including many incarcerated individuals diagnosed with a serious mental illness (SMI), "as well as a large group of patients experiencing mental suffering, increasing symptom severity, and/or elevated suicide risk triggered by their involvement in the criminal justice system and confinement in the jail setting." *Id.*, Ex. 3 at 5 (Seventh MH Monitoring Report, 2023). Between October 2024 and March 2025, out of an average daily Jail population of 2,817, 882 (31.3%, nearly a third) had an SMI diagnosis and 1,277 (45.3%, nearly half of the Jail population) required ongoing psychiatric services for medication management. *Id.*, Ex. 2 at 16–17 (DRAFT Tenth MH Monitoring Report, 2025). And roughly 400 people (about 14%) had symptoms and functional impairments severe enough for "placement in specialized mental health units with enhanced services and monitoring such as the Special Management Unit (SMU), Administrative Management Housing (AMH) . . . , and inpatient level of care in an Acute Psychiatric Unit (APU)." *Id.*

Correctional deputies play a critical role in helping incarcerated people with mental illness access mental health care. Especially important are the correctional staff who serve as Multi-Support Deputies (MSDs)/Access to Care Officers. *See id.*, Ex. 4 at 15 (Fifth MH Monitoring Report, 2022). Those deputies provide vital support health services, including by escorting incarcerated people to appointments and facilitating group services. *Id*. Correctional deputies are also essential to the care of patients housed in segregated housing units, because such individuals "require closer monitoring for

timely identification of psychiatric decompensation and as needed interventions." *Id.*, Ex. 3 at 5 (Seventh MH Monitoring Report, 2023).

But for years, the County has failed to provide sufficient custody staff to ensure "adequate care" for incarcerated individuals with mental health needs. *See id.*, Ex. 3 at 14 n.10 (Seventh MH Monitoring Report, 2023). Since at least 2022 there have consistently been over 100 vacant correctional deputy positions. *Id.*, Ex. 6 at 9 (Sixth MH Monitoring Report, 2023); *id.*, Ex. 7 at 13 (Eighth MH Monitoring Report, 2024). And the Mental Health Monitor's most recent report shows that the situation is getting worse, not better—the overall correctional-deputy vacancy rate has "increased . . . relative to prior review periods," with "148 vacant deputy positions." *Id.*, Ex. 2 at 4 (DRAFT Tenth MH Monitoring Report, 2025); *see also id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025) (reporting that although "the Sheriff's Department is making progress in the hiring of new deputies," that progress is "offset by retirements.").

As the Mental Health Monitors have documented repeatedly, "the mental health department does not have sufficient access-to-care custody support to meet the minimum care requirements outlined in the remedial plan." *Id.*, Ex. 7 at 15 (Eighth MH Monitoring Report, 2024); *see also id.*, Ex. 6 at 7 (Sixth MH Monitoring Report, 2023); *id.*, Ex. 2 at 21–22 (DRAFT Tenth MH Monitoring Report, 2025). Clinicians "lack sufficient escort officers to meet with their assigned patients which poses risk and results in inefficiencies throughout the shift." *Id.*, Ex. 2 at 19 (DRAFT Tenth MH Monitoring Report, 2025). And "leadership and line staff have consistently reported that insufficient custody staffing serves as [a] barrier to care as there are not enough officers to escort patients to confidential locations and provide supervision for staff safety." *Id.*, Ex. 7 at 2–3, 15–16 (Eighth MH Monitoring Report, 2024); *see also id.*, Ex. 2 at 57 (DRAFT Tenth MH Monitoring Report, 2025).

The Mental Health Monitors are not alone in their concerns. The County's custody leadership recently "unanimously reported that an additional 100 allocated

positions are needed to support compliance with Consent Decree missions and routine operations." *Id.*, Ex. 2 at 5 (DRAFT Tenth MH Monitoring Report, 2025).

In addition to employing too few custody staff, the County's failure to align custody staff schedules with mental-health staff schedules has created inefficiencies and wasted time. For example, there is a "two-hour daily window" during which mental health providers "are unable to complete appointments because housing-unit officers take back-to-back lunches." *Id.*, Ex. 2 at 22 (DRAFT Tenth MH Monitoring Report, 2025); *see also id.*, Ex. 4 at 33 (Fifth MH Monitoring Report, 2022); *id.*, Ex. 9 at 17 (Third MH Monitoring Report, 2021). What's more, the custody staffing levels, "are inadequate to . . . sustain minimum mental-health and rehabilitative service delivery," or to "demonstrate that patients are offered minimum out of cell time to prevent isolation and risk of deterioration." *Id.*, Ex. 2 at 10–11 (DRAFT Tenth MH Monitoring Report, 2025). Not once in the last five years have the Mental Health Monitors found the County to be in substantial compliance with the Remedial Plan Provision requiring adequate custody staffing. *Id.*, Ex. 2 at 19 (DRAFT Tenth MH Monitoring Report, 2025). In fact, since November of 2021, the Monitor has found the County to be totally non-compliant with the staffing requirement in five out of the last seven monitoring cycles and in only partial compliance in the remaining two.[4] *Id.* Again, this is not just the Mental Health Monitor's opinion—it's the County's too. In its own "180-Day Reports" the County has never found itself in substantial compliance with its obligation to "provide sufficient staff . . . to comply with the Remedial Plan." *E.g.*, *id.*, Ex. 10 at 2 (180-Day MH Report, Apr. 24, 2025) (self-rated partially compliant for Nov. 2024 and Apr. 2025); *id.*, Ex. 11 at 3 (180-Day MH Report, Nov. 1, 2024).

At bottom, until the core issues surrounding insufficient custody staffing for the number of inmates requiring mental health care at the Jails "are resolved, progress

[4] At the agreement of the parties, the Mental Health Monitor deferred rating the County in his November 2023 report. Specter Decl., Ex. 3 at 14 (Seventh MH Monitoring Report, 2023).

toward substantial compliance with the mental health provisions of the . . . Consent Decree cannot be achieved." *Id.*, Ex. 2 at 5 (DRAFT Tenth MH Monitoring Report, 2025).

**ii. Medical Care[5]**

Since at least 2022, the Medical Monitors have also consistently highlighted the role that insufficient custody staff plays in the County's continued failure to provide timely and minimally adequate medical care. *See* Specter Decl., Ex. 12 at 2–3 (Fourth Medical Monitoring Report, 2022); *id.*, Ex. 13 at 2, 5, 8 (Sixth Medical Monitoring Report, 2024); *id.*, Ex. 14 at 2, 6–7 (Seventh Medical Monitoring Report, 2024); *id.*, Ex. 15 at 2 (Eighth Medical Monitoring Report, 2025); *id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025).

For years, the Medical Monitors have reported the same thing: the County's allocation of six deputies to medical and nursing functions—four at Elmwood and two at the Main Jail—cannot meet the incarcerated population's healthcare needs. *Id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025) ("The Custody Bureau has allocated six deputies . . . to access to medical/nursing care functions. By report from staff, as well as from the monitor's observations, this is not sufficient to meet the needs of the healthcare program."); *id.*, Ex. 15 at 2 (Eighth Medical Monitoring Report, 2025) ("The

[5] Dr. Joe Goldenson, MD, has been the court appointed Medical Monitor since early 2020. Dr. Goldenson has 40 years of correctional health care experience, including 28 years working for Jail Health Services of the San Francisco Department of Public Health, spending 22 of those years as the Director and Medical Director. He has worked extensively as a correctional health medical expert and court monitor, serving as a medical expert for the Northern District of California for 30 years, including currently as a court medical expert in *Plata v. Newsom*, No. 3:01-CV-01351 (N.D. Cal). He's also served as a medical expert and monitor at Cook County Jail in Chicago; Los Angeles County Jail; at other jails in Washington state, Texas, and Florida; and at prisons in Illinois, Ohio, and Wisconsin. *See* Specter Decl., Ex. 1 (Dr. Goldenson curriculum vitae).

Angela Goehring has a Bachelor of Science degree in Nursing and a Master of Science in Healthcare Administration. Ms. Goehring has 25 years of experience in correctional healthcare services. She has served as an administrator in both private and public healthcare settings and in prisons and jails. Ms. Goehring also as served as a monitor in other jail systems, including Dade County, Florida. She has qualified as an expert in federal court proceedings. *See id.*, Ex. 1 (Angela Goehring curriculum vitae).

Custody Bureau has allocated six deputies . . . to access to care functions. By report from staff, as well as from the monitor's observations, this is not sufficient to meet the needs of the healthcare program."); *id.*, Ex. 12 at 2 (Fourth Medical Monitoring Report, 2022) ("There are insufficient custody staff dedicated to health care operations, and record review shows that access to care is limited by . . . minimum staffing and deputies being 'too busy'."). The County's "inability . . . to hire sufficient custody staff over a period of many years is a major cause of the lack of timely care," *id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025), and makes compliance with the Consent Decree's mandate that the County provide constitutionally adequate medical care impossible.

As with mental health care, the County's "vacant custody positions directly impact" health care staff's access to patients. *Id.*, Ex. 15 at 4 (Eighth Medical Monitoring Report, 2025). The County's continued failure to resolve the understaffing problem means that patients do not have timely access to medical providers for evaluation and treatment of serious medical conditions, resulting in "delayed diagnosis and treatment, preventable pain and suffering, demonstrable harm to patients, and risk of harm to the jail population." *See id.*, Ex. 12 at 1 (Fourth Medical Monitoring Report, 2022); *id.*, Ex. 13 at 2 (Sixth Medical Monitoring Report, 2024); *id.*, Ex. 14 at 2–3 (Seventh Medical Monitoring Report, 2024); *id.*, Ex. 15 at 2 (Eighth Medical Monitoring Report, 2025); *id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025). The Medical Monitors have also repeatedly concluded patients with chronic illnesses do not consistently receive timely, minimally adequate care. *See id.*, Ex. 12 at 37 (Fourth Medical Monitoring Report, 2022); *id.*, Ex. 26 at 6 (Fifth Medical Monitoring Report, 2023); *id.*, Ex. 13 at 51 (Sixth Medical Monitoring Report, 2024); *id.*, Ex. 14 at 40 (Seventh Medical Monitoring Report, 2024); *id.*, Ex. 15 at 2 (Eighth Medical Monitoring Report, 2025); *id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025).

Similar to the Mental Health Monitors, the Medical Monitors have, since 2022, rated the County only as partially compliant with the Remedial Plan Provision requiring adequate staffing. *Id.*, Ex. 8 at 6 (Ninth Medical Monitoring Report, 2025). The County,

in its 180-Day Reports, agrees. *E.g.*, *id.*, Ex. 16 at 3 (180-Day Medical Report, Jun. 25, 2025). The County has described its "efforts" at addressing the custody staffing issue, but for years those efforts have yielded little to no progress in achieving compliance. In an October 2022 report, the County noted that "challenges related to the Custody . . . Officer vacancies continue to be a problem," but insisted that it was taking meaningful steps to address those challenges, including that the "Sheriff's Office ha[d] just increased pay by 11% and is looking at lateral pay incentives to recruit candidates . . . ." *Id.*, Ex. 17 at 3 (180-Day Medical Report, Oct. 14, 2022). Yet a 2024 report showed that, despite the County's claims of "slowly rising" recruiting numbers, there remained a whopping 118 deputy vacancies. *Id.*, Ex. 18 at 2 (180-Day Medical Report, Mar. 15, 2024). As of the County's most recent 180-Day Medical report, that vacancy rate remains unchanged, and there are now 119 deputy vacancies. *Id.*, Ex. 16 at 3 (180-Day Medical Report, Jun. 25, 2025). County staff and the Medical Monitors consistently agree that these vacancies make it impossible "to meet the needs of the healthcare program." *Id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025).

The Medical and Mental Health Monitors' Reports also explain that the impacts of the County's continued noncompliance are severe: Because of the County's staffing shortages, clinicians are limited in when they can see patients—resulting in missed appointments, delayed diagnosis and treatment, preventable pain and suffering, and an unreasonable risk of harm to the Jail population; incarcerated people with serious mental illness do not receive necessary therapy sessions or minimum out of cell time; and patients are denied confidential health encounters. *E.g.*, *id.*, Ex. 12 at 23–25 (Fourth Medical Monitoring Report, 2022); *id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025); *id.*, Ex. 4 at 13, 33, 71 (Fifth MH Monitoring Report, 2022); *id.*, Ex. 6 at 9–10 (Sixth MH Monitoring Report, 2023); *id.*, Ex. 7 at 2–3 (Eighth MH Monitoring Report, 2024).

### C. Repeated Attempts To Move The County Towards Compliance With The Consent Decree.

In their 180-Day Reports, the County has described its "efforts" to address the custody staffing issue. But those efforts have yielded little to no progress in achieving compliance. In a 2022 report, for example, the County recognized the understaffing issue and explained that it would address the issue by adding one or two deputies specifically assigned to support healthcare and referred to as MSDs, to the County Jails roughly every three months. *Id.*, Ex. 19 at 2 (180-Day MH Report, Dec. 2, 2022). But by April 2023, "only eight of 43 allocated MSD positions had been filled . . . ." *Id.*, Ex. 6 at 9 (Sixth MH Monitoring Report, 2023). Notably, those eight positions were divided among the two Jails, and current MSDs told the Monitors that meeting the "healthcare demands of the incarcerated population" likely required "25 MSDs at each facility." *Id.* at 9–10. Two years later, the County continued to report custody staffing challenges and it was still providing only 6 Access to Care Officers and 18 MSDs between the two Jails. *Id.*, Ex. 10 at 9 (180-Day MH Report, Apr. 24, 2025); *id.*, Ex. 2 at 5 (DRAFT Tenth MH Monitoring Report, 2025).

Based on the repeated findings of the Mental Health and Medical Monitors that the level of custody staff was (and is) insufficient to ensure minimally adequate mental health and medical care for the number of folks incarcerated in the County's Jails, Plaintiffs' have tried to work with the County to resolve the noncompliance. Those efforts have focused on two potential solutions: (1) increasing custody staff; and (2) reducing the demand for services by reducing the Jails' population, and thereby reducing the number of custody staff necessary to reach compliance. Neither has borne fruit.

In late 2021, for example, Plaintiffs identified access to healthcare—and specifically the negative impact insufficient custody staffing had on such access—as a priority issue for the County to address. *See id.*, Ex. 20 (Memorandum of Understanding ("MOU") (Dec. 9, 2021)). The County Executive, the Chief of Corrections, and the Sherriff signed a MOU with key provisions designed to improve access to healthcare events, including to: (1) "[P]rovide a plan to address the number of dedicated Sheriff's

Office staff who are reasonably necessary to provide access to healthcare events in order to meet the requirements of the Consent Decree"; (2) "evaluate the staffing plan and propose staffing allocation of Sheriff's Office staff who will be dedicated to provide access to healthcare events"; (3) mandating that "Sheriff's Office staff who are dedicated to providing access to healthcare events may not be re-assigned to other custodial duties" absent an emergency; and (4) provide a quarterly "updated analysis of the staffing plan that evaluates the number of Sheriff's Office staff who are reasonably necessary to provide adequate access to healthcare events and . . . adjust those staffing allocations as necessary." *Id*. at 2–3.

With limited progress stemming from the MOU, and following a concerning monitoring visit, Plaintiffs sent a demand letter to the County in April 2022 invoking the dispute resolution procedures for noncompliance with the medical and mental health—among other—provisions of the consent decree. Plaintiffs asserted that the remedy was to reduce the Jail population, and the County agreed that "fewer inmates would reduce the demand for services and improve safety within the jail." *Id*., Ex. 22 at 2 (Letter from County Counsel to Plaintiffs' Counsel, July 27, 2022).

Plaintiffs asked this Court to schedule a mediation to address issues related to the size of the Jail population and limited custody staff. Clerk's Notice Setting Settlement Conference, Dkt. No. 131. Two mediation sessions in August and October 2022 failed to produce any concrete agreement to reduce the Jail population in an effort to reach compliance with the Consent Decree and Remedial Plan's medical and mental health care provisions. The mediations did, however, result in joint acknowledgement that the size of the Jail population, compounded by other challenges including staffing, "is a critical factor in the ability to provide services to the jail population." Order re Stress Test 2, Dkt. No. 137. Accordingly, the parties agreed to conduct a "Stress Test" with the goal of evaluating the "jail population and to look for opportunities to reduce the population safely." *Id.*

In early 2023, the parties consulted with a County-retained expert, criminologist Dr. James Austin, who would work with criminal justice stakeholders in the County to evaluate the Jail population and to look for opportunities to safely reduce the population, including through the utilization of the "Stress Test," and to determine whether criminal cases could be processed more efficiently. *Id*. Various criminal justice stakeholders participated in the Stress Test, and they continue to meet periodically to discuss ways to speed up the processing of criminal cases. But while some improvements have been made, there has been no significant reduction in the Jail population. *See* Specter Decl., Ex. 23 at 1 (James Austin, Jail Population Analysis, Jun. 9, 2025) (chart of average daily Jail population over time showing that between 2022 and 2025, the population has hovered between about 2,500 and 3,000).

This Court again convened a settlement conference in September 2023 to again negotiate improvements in healthcare inadequacies related to the Jail population and understaffing. Clerk's Notice re Settlement Conference Call, Dkt. No. 140. The Medical Monitors attended, and the County was represented by the Sheriff, medical leadership, and the Chief Operating Officer of the County. Minute Entry for Proceedings Held Sept. 29, 2023, Dkt. No. 141. Although the parties reached an agreement around certain aspects of the Remedial Plan designed to improve medical care, they reached no agreement regarding the inadequacy of custody staffing or decreasing the Jail population.

As of this summer, and notwithstanding the above efforts, the County had made little to no progress on the custody staffing and overpopulation problems. County-retained expert Dr. Austin reported in early July 2025 that the County Jail system was "suffering from extreme security staff shortages," with 20% of authorized custody positions vacant—55 at the Main Jail and another 67 at the Elmwood facilities—and that there were "no prospects that additional staff will be hired to fill these and future vacancies." Specter Decl., Ex. 24 at 1 (James Austin, Jail Population Reduction Estimates, July 10, 2025). As a result, and just as the Monitors before him, Dr. Austin

found that the "jail population is not being properly supervised or provided access to required medical and mental health services in a timely or predictable manner." *Id*. And he warned that, without a "significant surge in the number of deputies that can be hired and retained"—approximately 100—"there will need to be a significant drop in the jail population of at least 450 and as much as 737" given the current custody staffing. *Id*. at 3.

Accordingly, the Parties have recently gone back and forth on a shared goal of meaningful population reduction to help the County achieve compliance with the Consent Decree. Plaintiffs, for their part, have emphasized repeatedly in those communications the urgency of the situation, writing:

- "[T]he critical fact is that there is a shortage of deputies . . . that is preventing the incarcerated population . . . from receiving adequate access to care, resulting in serious risk of harm," *id.*, Ex. 25 at 8 (Emails between Don Specter and Kavita Narayan);
- "The need to reduce the jail population is urgent. For the past several years the medical monitors have repeatedly found that there are insufficient deputies to provide adequate care," *id*. at 2; and
- "The County has two options to cure this continuing constitutional violation. It can recruit more deputies through more aggressive efforts and higher pay or it can reduce the population so that there are enough staff to meet the needs of the incarcerated population." *Id.*

The County, for its part, has responded that it's taking efforts by exploring measures that might impact the Jail population, including a "zero-dollar bail policy," "reduction in continuances," "case consolidation efforts," and "mental health assessments." *Id.* at 5–7. However, absent from the County's description of those efforts, as Plaintiffs pointed out, "is any indication of how much and when [those] measures can be expected to reduce the jail population." *Id.* at 2.

*        *        *

The experts agree: at its current custody staffing levels, the County cannot ensure constitutionally adequate mental and medical care. And despite Plaintiffs' repeated efforts over the past five years to work with the County make real progress towards addressing the custody staffing issue—either through a dramatic increase in custody staff or a decrease in the Jail population—the County has thus far proved unwilling to respond to this problem with the urgency it demands. Given the County's refusal to take all reasonable steps to bring it towards compliance with the Consent Decree, this Court's intervention is necessary to ensure that the endemic staffing shortages—and the devastating impact those shortages have on the ability of the class of Plaintiffs to obtain constitutionally adequate mental and medical health care—do not continue with no prospects for resolution.

## ARGUMENT

When a defendant violates court orders, the district court has broad power to fashion a remedy, even where such "a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also Hutto v. Finney*, 437 U.S. 678, 690 (1978) ("[F]ederal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced.").

Such powers include finding a party in contempt of court. *Hutto*, 473 U.S. at 690–91. "Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (cleaned up). Where "clear and convincing evidence" shows the alleged contemnor violated a specific and definite order of the court, the burden then shifts to the contemnors to demonstrate they took "all reasonable steps to comply." *See Coleman v. Newsom*, 131 F.4th 948, 955–56 (9th Cir. 2025). A party may be held in contempt even if its conduct was not willful. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006). That's because "there is no good faith exception to the requirement

of obedience to a court order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

District courts have wide latitude to make contempt determinations, especially where "the court has been overseeing a large, public institution for a long period of time." *Coleman*, 131 F.4th at 955–56 (quoting *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992)); *see also Lab./Cmty. Strategy. Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1121 (9th Cir. 2009) ("The district court, armed with a decade of knowledge about the case, was uniquely positioned to determine whether there had been substantial compliance.").

Contempt in this case is clear. The Court issued a "specific and definite" order requiring that Defendant maintain custodial staffing sufficient to meet the demands of the Remedial Plan. Defendants have disregarded this order. For years, Plaintiffs and the Mental Health and Medical Monitors have sounded the alarm that compliance with the Consent Decree and Remedial Plan provisions involving healthcare cannot be achieved without addressing core understaffing and overpopulation issues. Yet the County has, for years, failed to take all reasonable steps to meaningfully improve its custodial staffing ratios. Because the Court's order is specific and the evidence of the County's violations is clear and convincing, the Court should hold the County in contempt and issue sanctions.

## I. Defendants Are In Civil Contempt Because They Knowingly Continue To Violate The Court-Ordered Consent Decree and Remedial Plan.

### A. The Court Issued A "Specific And Definite" Order.

To "meet the minimum level of health care necessary to fulfill Defendant's obligations under the Eighth and Fourteenth Amendments," the Court-ordered Consent Decree requires Defendants to "fully implement all of the remedial measures set forth in the Remedial Plan." Consent Decree ¶ 10. Relevant here, the Medical and Mental Health portion of the Remedial Plan has a section governing "Staffing and Resources," and requires, among other things, that the County must provide "sufficient . . . custodial

staff . . . to comply with this Remedial Plan." Remedial Plan at 5–6. The Court further ordered that the Consent Decree remain in effect until the County "is in substantial compliance with the Remedial Plan for one year," Consent Decree ¶ 30, and it "retain[ed] jurisdiction to enforce the terms of this Consent Decree . . . through specific performance and all other remedies permitted by law until Defendant fulfills its obligations under this Consent Decree," *id.* ¶ 29.

This Court, in approving the Consent Decree, issued a "specific and definite" order to be enforceable on contempt. *See Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 860 (9th Cir. 2007) ("It is well established that the district court has the inherent authority to enforce compliance with a consent decree that it has entered in an order, to hold parties in contempt for violating the terms therein, and to modify a decree."). Where a consent decree commands certain conduct—like the Consent Decree and incorporated Remedial Plan do here—that consent decree constitutes a "specific and definite" order for the purposes of a contempt finding. *See Lancaster v. Tilton*, 2007 WL 1807825, at *5–6 (N.D. Cal. June 21, 2007). That is so even where the district court does not "anticipate every action to be taken in response to its order," or "spell out in detail the means in which its order must be effectuated." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000); *see also N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 917 (5th Cir. 1996) ("Although this order does not choreograph every step, leap, turn, and bow of the transition ballet, it specifies the end results expected and allows the parties the flexibility to accomplish those results."), *overruled on other grounds*, *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020)

A finding that a court order meets the "specific and definite" requirement is especially appropriate where the defendant participated in negotiating the terms of the order at issue. *E.g.*, *Jeff D. v. Kempthorne*, 2007 WL 461471, at *4 (D. Idaho Feb. 7, 2007); *Nunez v. New York City Dep't of Corr.*, 758 F. Supp. 3d 190, 218 (S.D.N.Y. 2024)

(finding order clear and unambiguous where "the orders at issue [were] entered on consent, after Defendants participated in negotiating and drafting their precise terms, [and] Defendants [had] never suggested to the Court that additional clarity was needed"); *see also Dep't of Fair Emp. & Hous. v. L. Sch. Admission Council Inc.*, 2018 WL 1156605, at *18 (N.D. Cal. Mar. 5, 2018) (concluding "a party's agreement, adopted by the Court as a consent decree, to abide by a third party's determinations on specified topics can be enforced through contempt," where the party had a role in selecting the third party and agreed to the specific topics the third party would make determinations on). That makes sense: the specific and definite requirement serves to ensure that a party has "fair notice" of proscribed conduct to which it has agreed rather than imposing obligations on a party that it has not voluntarily assumed. *Gates v. Shinn*, 98 F.3d 463, 468 n.3 (9th Cir. 1996).

The District of Idaho's decision in *Jeff D. v. Kempthorne* is on point. 2007 WL 461471, at *4. There, the court adopted a consent decree negotiated and agreed to by the parties. *Id.* at *1. Among other things, the consent decree required that defendants "provide the class members"—indigent children with "severe emotional disturbance"—"with facilities and staff for community-based mental health programs and services." *Id.* As part of the agreement, the parties created an "Implementation Plan" with various "Action Items" that was adopted by the court. *Id.* at *2. Those Action Items included tasks like "develop a communications mechanism to inform the courts and other justice officers about the local councils and how to access them" and "identify areas of the state where gaps in respite care capacity exist and develop strategies for recruitment and retention to increase capacity." *Id.* at *1–2, *17, *34 (cleaned up). Although "many of the Action Items lack[ed] specificity," leaving it to the parties to figure out how to obtain compliance, the court found that they represented a "fair expression of the parties' understanding of the defendants' obligations of the consent decree." *See id.* at *4. Accordingly, in assessing whether the defendants were in contempt, the court evaluated

the evidence to determine whether the defendants violated any of the Action Items by clear and convincing evidence. *Id*.

Here, we have a substantially similar situation: This Court adopted the parties' Consent Decree along with the incorporated—and jointly developed and agreed upon—Remedial Plan. The action items in the Remedial Plan, just as in *Kempthorne*, represent a "fair expression" of the parties' understanding of the County's responsibilities and obligations to comply with the Consent Decree, notwithstanding the fact that they give the parties flexibility in determining the best way to achieve compliance. *See id*. at *4; *see also Lancaster*, 2007 WL 1807825, at *5–6, *16 (concluding mandates in agreed consent decree that defendant provide condemned prisoners clothing "of good repair and of appropriate size" and provide "adequate equipment and materials for cleaning their cells" were specific and definite enough to support a finding of contempt if plaintiffs could show defendant was indeed violating those provisions). And the County has never suggested that it needed "additional clarity" about the Remedial Plan's requirement that it provide sufficient staff to ensure adequate delivery of mental and medical health care. *Nunez*, 758 F. Supp. 3d at 218 (finding defendants in contempt of a Court order where defendants participated in negotiating and drafting the terms of the order and "never suggested to the Court that additional clarity was needed.").

Thus, the Consent Decree and relevant Remedial Plan provision constitute sufficiently specific and definite court orders for contempt.

### B. Clear And Convincing Evidence Demonstrates That Defendant Is In Violation Of The Court's Order.

For years, the County has repeatedly failed to provide "sufficient . . . custodial staff . . . to comply with this Remedial Plan." Remedial Plan at 6. Because Plaintiffs have provided clear and convincing evidence of this violation, this Court should hold the County in contempt.

The Mental Health and Medical Monitors' reports, year after year, have raised

the same concerns about the County's obligation to provide constitutionally adequate mental and medical care to those it incarcerates: Insufficient staffing along with the size of the County's Jail population have been persistent barriers preventing the County from achieving substantial compliance with the Consent Decree and Remedial Plan. *E.g.*, Specter Decl., Ex. 2 at 3 (DRAFT Tenth MH Report, 2025); *id.*, Ex. 8 at 2 (Ninth Medical Monitoring Report, 2025); *see also supra* Factual Background, Section B. What's more, despite the Monitors' and Plaintiffs' repeated insistence that the County address its inadequate staffing levels or reduce the Jail population such that the existing staffing levels are sufficient, the County has failed to act with the sense of urgency the situation warrants. *Cf.* Specter Decl., Ex. 12 at 1 (Fourth Medical Monitoring Report, 2022). Instead, the County has become "complacent," and "this case has reached a point of stagnation." *Id.*, Ex. 7 at 3 (Eighth MH Monitoring Report, 2024); *see also supra* Factual Background, Section C.

The consistent findings of the expert Monitors, along with the County's complacency, is clear and convincing evidence that the County has violated the Consent Decree for years by failing to take necessary steps to obtain substantial compliance with, the Remedial Plan requirement that it provide adequate staffing.

**C. Defendants Have Not Taken All Reasonable Steps To Comply With The Consent Decree and Remedial Plan.**

When a defendant violates a specific and definite court order, it may avoid contempt only if it proves that it took "all reasonable steps within [its] power to comply" with the court's orders or that compliance was impossible. *Dual-Deck*, 10 F.3d at 695; *see also Coleman*, 131 F.4th at 957. Where a defendant neglects to "pursue certain reasonable steps that were available to it," it cannot meet that burden. *Coleman*, 131 F.4th at 957. The standard is stringent.

The Ninth Circuit's recent decision in *Coleman v. Newsom* is instructive. 131 F.4th at 957–58. There, the Ninth Circuit upheld a lower court's conclusion that the

State was in contempt of a court order requiring it to maintain a certain level of staffing to support minimally adequate mental health care for a class of people incarcerated in California's prisons. *Id*. The *Coleman* Court rejected the State's argument that it had taken all reasonable steps to comply with the district court orders because there were certain steps available that it failed to take. *Id*. Some of those reasonable steps, for example, were to reduce delays in the hiring process and reform the pension system, *see id.* at 958, regardless of whether this would be "difficult or expensive." *Id*. at 960. But the evidence showed that the State had not made meaningful efforts toward that end. *Id*. at 957–58.

Here, just as in *Coleman*, there are reasonable steps the County could take to comply with its obligations, including safely reducing the population as recommended by its consultant Dr. Austin, Specter Decl., Ex. 24 at 4, raising salaries to compensate for the high cost of living, *id.*, Ex. 25 at 3, reducing the time between an application and hiring, and providing flexible shifts. Indeed, over multiple cycles, the Monitors have concluded that one of the most significant barriers to achieving compliance with the Remedial Plan is addressing custody staffing deficiencies. *See, e.g.*, *id.*, Ex. 7 at 15 (Eighth MH Monitoring Report, 2024); Ex. 6 at 7 (Sixth MH Monitoring Report, 2023); *id.*, Ex. 2 at 21–22 (DRAFT Tenth MH Monitoring Report, 2025). But although the staffing crisis has continued to affect compliance with this Court's order, as of the most recent round of monitoring "the County's action plan remain[ed] unchanged from prior cycles," and the County submitted only "a generalized explanation for staffing shortages that has not addressed the underlying issues." *Id.*, Ex. 2 at 5 (DRAFT Tenth MH Monitoring Report, 2025). That is so even though County Counsel and Custody leadership, for example, "have repeatedly identified cost of living as a primary deterrent to custody officer recruitment and retention." *Id*. But, despite identifying a "primary" challenge to its compliance with the Remedial Plan, the Mental Health Monitor pointed out that "the County has not developed a comprehensive plan that directly addresses the

root causes of staffing instability." *Id.*; *see also id.*, Ex. 7 at 3 (Eighth MH Monitoring Report, 2024) ("Based on the County's repeated failures to follow through with their own documented plans for addressing staffing . . . limitations, which they have already acknowledged in their own prior 180-Day Reports serve as ongoing obstacles to compliance with various remedial plan requirements year after year, the monitor's perception is that the County has become complacent and that this case has reached a point of stagnation.").

The County says it has pursued "several promising avenues for increased recruitment and retention" of custody staff, and that it has approved wage increases (and retention bonuses)." Specter Decl., Ex. 21 at 7 (180-Day MH Report, Oct. 31, 2025). But, the County acknowledges that "the starting salary and benefits is not incentive enough to overcome the high cost of living of Silicon Valley, potential commute time and geographic location to family members should they relocate." *Id.*, Ex. 27 at 7. These admissions show that the County's efforts are insufficient to meet the "exacting standard" of substantial compliance required to avoid contempt. *See Coleman* at 957–58 (citing *Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016) ("While substantial compliance is not amenable to a mathematically precise definition, . . . merely taking significant steps toward compliance comes nowhere near satisfying this exacting standard." (cleaned up)).

Given the foregoing evidence, which clearly and convincingly demonstrates the County is (and has been for years) in violation of the specific provisions of the Remedial Plan requiring it to provide adequate staffing to ensure adequate health and mental health care for those incarcerated in the Jails, *see* Remedial Plan, Dkt. No. 109-1, a finding of civil contempt is appropriate.

### D. This Court Should Order Civil Contempt Sanctions That Will Coerce The County Into Compliance With The Remedial Plan.

The Court has broad and various powers to remedy a contempt. *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) ("District courts have broad equitable power to order appropriate relief in civil contempt proceedings."), *amended on denial of reh'g*, 335 F.3d 834 (9th Cir. 2003). Those powers may be exercised for one or both of two purposes: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947); *see also Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). Plaintiffs' contempt motion seeks relief that "coerces compliance with" this Court's order. *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016). Plaintiffs submit that the following remedy is justified and minimally necessary in order to stop ongoing harms and to prevent future noncompliance to the detriment of the Plaintiff class.

Plaintiffs seek court-ordered, conditional coercive sanctions. Such relief is warranted under Ninth Circuit precedent. *Coleman*, 131 F.4th at 965 (finding the imposition of fines "based on the average monthly salary for each unfilled position that the State would need to fill to reach a ten percent vacancy rate," was "reasonable and [could] be understood as an attempt to shift the State's incentives by eliminating the savings it achieves through noncompliance."). Here, as in *Coleman*, a conditional fine tethered to the savings the County enjoys monthly through its continued failure to employ adequate custody staff is "reasonable" and will serve "to shift the State's incentives by eliminating the savings it achieves through noncompliance." *Id*. The Court should impose conditional fines based on the County's failure to fill all allocated deputy positions. The amount of the fines shall be the salary plus benefits for each vacant deputy position. Those fines should be imposed monthly.

The County may reduce the number of vacant allocated positions subject to fines by decreasing the number of people incarcerated in the Jails. If the County chooses this option, the parties and the Court Monitors shall collaborate to determine the amount of

the reduction in the Jail population necessary to reduce the number of allocated positions.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant this motion finding the County in contempt. As a remedy, and in order to ensure constitutionally adequate delivery of mental and medical health care in the Santa Clara County Jails, Plaintiffs request that this Court impose for every month the County is not in compliance, a monthly fine commiserate with the savings the County enjoys through its noncompliance.

Dated: November 17, 2025 **PRISON LAW OFFICE**

*/s/ Donald Specter*

Donald Specter
dspecter@prisonlaw.com
Mackenzie Halter
mhalter@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621

Kyung Taeck Minn
rminn@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000

Attorneys for Plaintiffs